IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2004 Session

# KEVIN DEMERS, ET AL. v. WALTER WHITTENBURG, ET AL.

Appeal from the Circuit Court for Robertson County
No. 9908    John H. Gasaway, III, Judge

No.  M2003-00184-COA-R3-CV **- Filed May 27, 2004**

This case involves two Rule 12.02(6) motions to dismiss converted to motions for summary judgment through the filing of additional affidavits with Plaintiff's response to these motions. Although the trial court dismissed all claims against Defendants for failure to state a claim under Rule 12.02(6), we must review the evidence using a Rule 56 motion for summary judgment standard. Plaintiff alleged numerous business torts, conspiracy, intentional infliction of emotional distress, and defamation in this action against Defendants.  However, Plaintiff failed to provide any evidence from which a jury could return a verdict in favor of Plaintiff on any count alleged.  The trial court also granted Rule 11 sanctions against Plaintiff.  The judgment of the trial court is affirmed, but on summary judgment grounds.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed as Modified**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a separate concurring opinion.

Troy L. Brooks, Mt. Juliet, Tennessee, for the appellants, Kevin Demers and Demers, Inc.

Robert J. Mendes, Nashville, Tennessee, for the appellees, Walter Whittenburg, Randall Qualls, and Whittenburg, Inc.

Michael Ernest Evans, Nashville, Tennessee, for the appellee, Karen Annette Wallace Demers.

# MEMORANDUM OPINION[1]

## I.    FACTUAL HISTORY

The facts in this case hail back to the divorce of Plaintiff, Kevin Demers, from Defendant, Karen Wallace Demers, in May of 1998.  At the time of the divorce, Plaintiff was found to have an annual income of $250,000 from his business as a printing press broker, in which business his wife participated.  He was ordered to pay child support in the amount of $4,100 per month.  In December of 2000, Plaintiff filed a Petition to reduce his child support alleging a substantial decline in his business due to "market circumstances beyond his control."  He alleged his loss of business to be due to the internet obviating the need for an American printing press broker.

On January 23, 2001, Plaintiff was sued by Western Printing Company, Inc. in South Dakota regarding the purchase of a printing press by Western Printing.  Some time thereafter, Plaintiff decided to liquidate his business and cease operation.  He advertised extensively for an auction to be held on June 7, 2001 to accomplish this liquidation.  Western Printing Company found out about the liquidation and obtained a Restraining Order on June 6, 2001 at approximately 4:00 p.m. requiring Plaintiff to deposit all funds from the proceeds of the auction with the Chancery Court of Robertson County, Tennessee.  The Restraining Order was served on Plaintiff approximately one hour prior to the start of the auction the morning of June 7.  According to Plaintiff, the auction did not go as well as expected, and he blamed service of the Restraining Order for the alleged failure of the auction.

On February 20, 2002, Plaintiff filed an Amended Petition for reduction of his child support obligation wherein he stated that his business had been liquidated and ceased to exist.  He further alleged that he had had no income since the liquidation sale.  On February 26, 2002, the trial judge heard his child support petition and determined that he was voluntarily underemployed, refusing to reduce his child support.  Plaintiff appealed that ruling, but the court of appeals upheld the trial court's determination. *See Demers v. Demers*, No. M2002-01970-COA-R3-CV, 2003 WL 22938951 (Tenn.Ct.App. Dec. 10, 2003).

On June 5, 2002, Plaintiff filed a Complaint in federal court against Defendants in this case and other Defendants.  Plaintiff then dismissed Defendants in this case, Walter Whittenburg, individually, Whittenburg, Inc., Karen Wallace Demers, individually, and James Randall Qualls and filed this action against these named Defendants in Circuit Court for Robertson County on August 7, 2002.  The Complaint alleged seven causes of action:  (1) tortious interference with business relations, (2) tortious interference and inducement to breach contract, (3) civil conspiracy, (4) unfair

---

[1]  Court of Appeals Rule 10(b):

The Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value.  When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in a subsequent unrelated case.

competition, (5) intentional infliction of emotional distress, (6) defamation, and (7) punitive damages. These causes of action were based on allegations in the Complaint as follows:

6. At all relevant times herein, Defendant WALTER WHITTENBURG has lived at 1900 Nicholas Drive, Springfield, Tennessee 37172. This Defendant is the former secretary of the Corporation and vice-president of Demers, Inc., where he was employed for six years and was privy to confidential information and corporate secrets of Demers, Inc. This Defendant as a vice-president and secretary of the corporation had certain fiduciary responsibilities.

7. At all relevant times herein, Defendant WHITTENBURG, INC.'s primary business address has been 208th Avenue, Springfield, Tennessee 37172. Upon information and belief the Defendant corporation is believed to be a Tennessee Corporation. This Tennessee corporation is in direct competition with Demers, Inc. and Demers Parts.

8. At all relevant times herein, Defendant KAREN WALLACE DEMERS is the ex-wife of Plaintiff KEVIN DEMERS, who resides at 316 Clearview Drive, Springfield, Tennessee 37172. This Defendant also had access to confidential information of Plaintiffs and was directly connected to Defendants WALTER WHITTENBURG and RANDALL QUALLS. Defendant KAREN WALLACE DEMERS agreed to a three year non-compete clause in the Marital Dissolution Agreement, which was signed May 27, 1998. This agreement expired May 27, 2001, which was one week before the ex-parte injunction was signed. (See attached MDA as Exhibit #1 and attached Ex-Parte Injunction as Exhibit #2) Her erroneous statement "Kevin Demers has a way of closing down businesses to avoid creditors and law suits as he has done it before" fueled the ex-parte injunctive relief.

9. At all relevant times, the Defendant RANDALL QUALLS is the sales manager for Defendant WHITTENBURG, INC. The acts committed against the Plaintiffs by the Defendant RANDALL QUALLS were while he was employed by the Defendant WHITTENBURG, INC. Formerly, this Defendant was the sales manager of Demers, Inc. This Defendant had access to confidential information and Defendant also had intimate knowledge of the business of Kevin Demers and Demers, Inc. Defendant RANDALL QUALLS has also been known to have made life threatening statements which were recorded, against Kevin Demers. These recorded statements contain and also acknowledge confidential information about the business affairs of the Plaintiffs. It also contained confidential information about ongoing litigation of the Plaintiffs in Aberdeen South Dakota (see attached tape

transcript Exhibit #3).[2]  Previously in a separate incident, the Defendant RANDALL QUALLS called the police, and made a false report, against Plaintiff KEVIN DEMERS, and as a result of the false report, the Plaintiff was arrested.

. . . .

13.     Upon information and belief, Defendant WALTER WHITTENBURG, President of Whittenburg, Inc., approached the Defendant KAREN WALLACE DEMERS, and he and Defendant KAREN WALLACE DEMERS, devised a scheme to maliciously attack and to purposely interfere, with the existing business relationships and future business relationships of the Plaintiff KEVIN DEMERS and DEMERS, INC.  All Defendants named above participated in this scheme.

14.     The Defendants all acted in concert with a common purpose and scheme to intentionally damage and destroy the existing business relationships, and to intentionally interfere with the future business relationships, of Kevin Demers and Demers, Inc. and Demers Parts.

15.     Defendants WALTER WHITTENBURG, WHITTENBURG INC., RANDALL QUALLS and KAREN WALLACE DEMERS had intimate knowledge of the Plaintiff's business relationships and prospective business relationships between Demers, Inc. and their existing clients.  Those three Defendants acted in concert and intended to cause the breach or termination of the existing business relationships of Kevin Demers and Demers, Inc.

16.     All Defendants acted improper and had an (sic) improper motive and means to intentionally interfere with and destroy the business relationships of Plaintiff Kevin Demers and Demers, Inc.

17.     Specifically the Defendants Walter Whittenburg and Karen Wallace Demers along with the other Defendants made false accusations about the Plaintiff that caused an Ex-Parte Injunction to be issued against the Plaintiff of (sic) June 6, 2001 at 4:20 p.m. (See attached Ex-Parte Injunction as Exhibit 2). Further, this injunction was served improperly on the Plaintiff at approximately 10:15 a.m. on June 7, 2001. The Plaintiff Kevin Demers and others personally witnessed a parked vehicle later known to be the process servers waiting at approximately 9:00 a.m. outside of the premises of Demers, Inc. located at 800 Bill Jones Industrial Drive, Springfield, Tennessee.  The process servers were parked outside of the premises for approximately one hour along side the road, waiting until the last minute, which resulted in the auction not starting on time.  These actions resulted in a severed (sic)

_____

[2] This 'transcript' consisted of an unsworn statement of Plaintiff's girlfriend regarding threatening calls she claims to have received from an unidentified person.

chilling effect of the absolute auction. The two process servers acted outrageous and with total disregard to the Plaintiffs by waiving the exposed Ex-Parte Injunction inside and outside of the Plaintiff's place of business, in view of highly banked confirmed bidders, where the Plaintiff's absolute auction was being conducted on June 7, 2001. The Plaintiff's absolute auction had been widely advertised both in the United States, Canada and internationally. The absolute auction was scheduled to start at 11:00 a.m. on June 7, 2001. (Please see attached Advertisement as Exhibit #4). The process servers purposely and intentionally delayed serving the Ex-Parte Injunction on the Plaintiffs. This was done to delay giving the Plaintiffs ample opportunity to challenge the validity of the Ex-Parte Injunction.

. . . .

. . . The result of the civil conspiracy of the Defendants and the outrageous conduct of the process serves of the Ex-Parte Injunction, resulted in a severe chilling of the auction. The chilling effect resulted in a severe pecuniary loss to the Plaintiff.

. . . .

Upon information and belief the Defendants WALTER WHITTENBURG, KAREN WALLACE DEMERS and JAMES RANDALL QUALLS prior to the absolute auction sale, contacted other third parties to spy on the auction and disseminate false information about the Plaintiffs. These actions were done after General Sessions Judge Max Fagan ordered the Defendants WALTER WHITTENBURG and JAMES RANDALL QUALLS to stay away from the absolute auction. These same Defendants disseminated false information to prospective buyers to cause them not to participate in the Plaintiff's absolute auction.

. . . .

20.     There was a valid business relationship between Plaintiff and an existing sixteen year customer base of Demers, Inc. The Defendants WALTER WHITTENBURG, RANDALL QUALLS and KAREN WALLACE DEMERS, all had intimate and express knowledge of the relationships that Kevin Demers and Demers, Inc. had with their client base throughout the United States, Canada and in Europe.

21.     The Defendants intentionally interfered or sought to interfere with these relationships and cause the breach or termination of the existing business relationships.

. . . .

-5-

24.    There was a binding contractual relationship between Plaintiffs and their existing customer base.  The Defendants caused interference to the absolute auction being conducted by Joseph Fin Auctioneer.  The absolute auction could not be stopped because the Plaintiff was under contact to conduct an absolute auction.  The chilling effect could not be discovered by the Plaintiffs until the auction had already started.

25.    Defendants WALTER WHITTENBURG, RANDALL QUALLS and KAREN WALLACE DEMERS have express intimate knowledge of these contractual relationships.  The contractual relationships that existed, one of which was the contract to hire the auctioneer Joseph Fin.  Further, as stated in the Facts section of this Complaint, this absolute auction was widely advertised throughout the United States, Canada and the world.

26.    Defendants intentionally interfered or sought to interfere and induce a breach of the contractual relationships.

       . . . .

29.    The Defendants each had the intent and knowledge of each other's intent and acted in concert to stop the absolute auction of the Plaintiffs and caused the Plaintiffs' pecuniary loss.

       . . . .

31.    Defendants have engaged in conduct sufficient to establish tort liability on theories of interference with business relations, interference and inducement to breach Contract.

32.    Such acts were committed knowingly, intentionally and in bad faith.

33.    Such actions have deprived the Plaintiffs of customers and/or other prospective customers thus causing pecuniary damages to Plaintiffs, entitling them to damages.

       . . . .

35.    The extreme and outrageous conduct of the Defendants WALTER WHITTENBURG, WHITTENBURG, INC., RANDALL QUALLS and KAREN WALLACE DEMERS intentionally caused the Plaintiff KEVIN DEMERS severed (sic) emotional distress.  Therefore entitling the Plaintiffs herein named to damages. (See attached Affidavits of George Schick, Kevin Demers, and Neil Sutherland as Collective Exhibit #6)

. . . .

37.     The Defendants made false and defamatory statements against the Plaintiff KEVIN DEMERS and the Plaintiff's business, which caused a significant pecuniary loss to the Plaintiffs. Thus entitling Plaintiffs to damages. Many of these erroneous statements were contained in the Ex-Parte Injunction, which was signed on June 6, 2001 by a Circuit Court Judge of Robertson County. (See Attached Exhibit #2) (Also see attached Collective Exhibit #6), (Also see attached Affidavit of Plaintiff KEVIN DEMERS as Exhibit #7) These allegations were baseless and false.

. . . .

39.     The foregoing acts and omissions were committed knowingly, intentionally, fraudulently, maliciously and recklessly, thus entitling Plaintiff to punitive damages.

Defendants filed Rule 12.02(6) Motions to Dismiss. In response to their Motions to Dismiss, Plaintiff filed two affidavits alleging additional information. Plaintiff's Affidavit filed in response to the Whittenburg/Qualls Motion to Dismiss stated:

4.     Defendants Whittenburg and Qualls conspired with Defendant Karen Wallace Demers to steal my clients, disseminate false information to my suppliers, and basically to drive me out of business. They have intentionally interfered with my former and existing business relationships. They have caused Demers, Inc. to lose contracts with existing customers and suppliers. Specifically, after the absolute auction was held on June 7, 2001, Defendant Karen Wallace Demers, Walter Whittenburg, and James Randall Qualls contacted numerous existing customers of Demers, Inc. They disseminated false information about myself and my company to destroy these business relationships. Further, these Defendants contacted many of my suppliers and customers and disseminated false information about myself and my company to try and also destroy these business relationships. I received many calls back from these existing customers and my suppliers asking me why my ex-wife Karen Demers was contacting them. Further, these third parties have described to me the damaging and negative remarks made by the Defendants.

5.     Defendant Whittenburg on his last day of employment with Demers, Inc. stated he would "put me out of business," and he took numerous company files, rolodexes, metal gauges. Further, after leaving Demers, Inc. he subsequently asked employees of Demers, Inc. to steal parts for him and Whittenburg, Inc. Just recently, Defendant Whittenburg disseminated false information about myself and my company to Evert Jackson, Sr. of Franklin Printing located in Zanesville, Ohio. Defendant Whittenburg made certain statements about two employees of my company. Defendant Whittenburg said "one was an alcoholic the second employee, darn well doesn't give a damn about his work". Further, he made accusations

concerning the sale of a Heidelberg Printing Press that was sold by myself to Mr. Jackson twelve years ago. These false statements caused me to lose this sale of a Heidelberg Printing Press to Franklin Printing. I had to refund the deposit on this contract. This is just one of the many examples of Defendant Whittenburg's hostile actions toward myself and my company. This occurred on or about September 3, 2002 in Springfield, Tennessee.

6.    Defendant Qualls continues to constantly disseminate false information and damaging remarks about myself and Demers, Inc. This activity has been ongoing for the past two years. Specifically, the Defendant Qualls visits Larry's restaurant located in Springfield, Tennessee. This is one place that he disseminates false information and damaging remarks about myself and my company. I have been told by more than one person that this has occurred.

7.    Further, Defendant Qualls in the past has made life threatening statements against myself. These recorded statements contained and also acknowledged confidential information about my business affairs. The Defendant Qualls also had specific knowledge and was involved in participating with Defendant Whittenburg and Defendant Demers, in forwarding the false information that was used in the Ex-Parte Mandatory Temporary Restraining Order, issued by the Circuit Court of Robertson County. Further, Defendant Qualls in a separate incident has called the police and made a false report against myself. As a result of the report, I was arrested and jailed wrongfully.

Plaintiff's Affidavit filed in response to Defendant Karen Demers' Motion to Dismiss provided:

2.    The Defendant Karen Wallace Demers is my ex-wife. We were divorced on May 27, 1998. The Defendant Karen Wallace Demers has conspired with the other two defendants to financially harm myself and my company. Further, she has conspired with the other Defendants to physically harm me. On May 22, 2001, the Defendant Karen Wallace Demers made the following statement "Kevin has a way of closing down businesses to avoid lawsuits and creditors as he has done it before". This statement was made at a settlement conference in the parties' divorce case. This statement was made less than two weeks before my absolute auction. This statement was also made in front of two Robertson County Attorneys and my accountant George Schick.

3.    Further, the Defendant Karen Wallace Demers contacted Jerry Spurlock, a local business man and asked him to spy on my auction. The auction was conducted on June 7, 2001. On June 6, 2001, the Defendant Karen Wallace Demers takes an unexpected trip to Gatlinburg, Tennessee with our three minor children. This trip was not planned and done at the very last minute. The Defendant Karen

Wallace Demers was out of town on the day of the auction, and continues to use that hurried and unexpected trip to Gatlinburg, Tennessee as her alibi.

4. The Defendant Karen Wallace Demers returned from the hurried trip to Gatlinburg, Tennessee on June 8, 2001. This was after the absolute auction was chilled and the proceeds of my absolute auction were locked up by the Ex-Parte Mandatory Restraining Order that was issued by the Robertson County Circuit Court. (The Ex-Parte Mandatory Restraining Order was signed by a Circuit Court Judge Michael Jones at approximately 4:20 p.m., June 6, 2001.) I was not given any notice of the Ex-Parte Mandatory Restraining Order until the morning of my absolute auction, June 7, 2001. The Ex-Parte Mandatory Restraining Order was not necessary because I had already complied with the instructions of the Federal Court in South Dakota.

5. The Defendant Karen Wallace Demers conspired with Defendants Walter Whittenburg and Randall Qualls to close down and chill my absolute auction held on June 7, 2001.

6. The Defendant Karen Wallace Demers and Defendants Whittenburg and Qualls were behind contacting and hiring the Attorneys in Clarksville, Tennessee, to prepare and draft and file the 56 (fifty six) page Ex-Parte Mandatory Restraining Order against my company and myself. This Ex-Parte Mandatory Restraining Order was served on me at my place of business in Springfield, Tennessee on the morning of June 7, 2001. This was less than one hour before my auction was to begin. This Ex-Parte Mandatory Restraining Order effectively chilled my absolute auction that had been widely advertised in the United States, Canada and abroad. Because the manner in which the Ex-Parte Mandatory Restraining Order was served was both outrageous and unnecessary. I had no time to react because it was served less than one hour before my auction was to begin.

7. The sale of my inventory was severely lessened by the chilling effect of this Mandatory Restraining Order. I lost as a result of the Defendants' actions approximately $1,000,000.00 in assets and equity.

8. The Defendant Karen Wallace Demers had access to the confidential information about myself and my company, which was supplied to the Clarksville Attorneys. This information was falsely disseminated and appeared in the Affidavit of Stephen Pfeiffer who is the President of Western Printing Incorporated. Further, I would submit that Defendants (sic) Karen Wallace Demers was one of the Defendants that caused the Western Printing lawsuit to he filed against me in the United States District Court of South Dakota.

9.     The Defendant Karen Wallace Demers has made threatening comments to me that she was going to "ruin me, kill me, or have me killed."

Defendant, Karen Demers, also filed a Motion for Rule 11 Sanctions.

On October 10, 2002, Plaintiff filed a Proposed Amended Complaint. The Motions to Dismiss, Motion to Amend Plaintiffs' Complaint, and Motion for Rule 11 Sanctions were heard on October 11, 2002. At that time, the court refused to grant Plaintiffs' Motion to Amend and granted Defendants' Motions to Dismiss. The trial court's Order provides, in pertinent part:

> The Court has fully reviewed all of the pleadings and the entire record in this matter, including the proposed amended complaint submitted by Plaintiffs on October 10, 2002. After fully considering all of these matters and the argument of counsel, the Court hereby orders as follows:
>
> 1.     Ms. Demers motion to dismiss this matter with prejudice is granted. It is clear from Plaintiffs' original complaint and the proposed amended complaint that the statute of limitations in connection with any claim alleged in connection with Ms. Demers has expired.
>
> 2.     The motion to dismiss filed by the Whittenburg Defendants is granted. Plaintiffs' original complaint and proposed amended complaint do not set forth adequate well-plead (sic) facts to state any of the purported causes of action. The Court also finds that Plaintiffs' original complaint and proposed amended complaint fail to state causes of action for which relief may be granted for the reasons asserted in the motions, briefs and oral argument presented by Ms. Demers and the Whittenburg Defendants.
>
> 3.     The Plaintiff's motion to amend the complaint in this matter is denied. The Court finds that Plaintiffs (sic) have had adequate time to attempt to plead a valid cause of action and have failed to do so in the proposed amended complaint. The Court further finds that it is clear from the volume of pleadings filed by Plaintiffs that Plaintiffs have had an adequate opportunity to seek to amend their complaint to plead valid causes of action. Any further efforts would be futile.
>
> 4.     Ms. Demers motion for sanctions against Plaintiffs and their counsel, Mr. Troy L. Brooks, is granted. The Court finds that, although reasonable parties and counsel may frequently be able to disagree about the application of a statute of limitations to a particular case, this is not such a case. Accordingly, Ms. Demers is entitled to be reimbursed for all attorneys' fees and other costs incurred after her counsel advised Plaintiffs through their counsel that the statute of limitations precluded any action against her.

Defendant appeals these rulings of the trial court.

## II.     DENIAL OF LEAVE TO AMEND THE COMPLAINT

Although Tennessee Rule of Civil Procedure 15 provides that leave to amend should be given freely when justice so requires, this matter is left to the sound discretion of the trial court and is reviewed under an abuse of discretion standard. *Merriman v. Smith*, 599 S.W.2d 584 (Tenn.Ct.App. 1979).

Since a Tenn. R. Civ. P. rule 12.02(6) motion is not deemed to be a responsive pleading within the meaning of Tenn. R. Civ. P. rule 15, Appellant should have been allowed to amend his complaint, and the trial court erred in denying the Motion to Amend. *Richmond Country Club v. CRC Equities, Inc.*, 832 S.W.2d 554 (Tenn.Ct.App. 1991).

While futility of a proposed amendment provides ample reason to deny a motion to amend after a responsive pleading has been filed, *Merriman v. Smith*, *supra* that rule does not apply to motions to amend filed before a responsive pleading is filed. We will therefore consider the amended complaint.

With regard to those causes of action pled in the original Complaint, the Amended Complaint adds no additional facts, but merely continues to state the same vague allegations and legal conclusions. The only new allegations made in the Amended Complaint are regarding activity which has occurred since the filing of the original Complaint. Most of these new "facts" relate to business torts and are alleged to have occurred after the time that Plaintiff previously testified that his business ceased to exist. *See Demers*, 2003 WL 22938951, at *1-2. The remainder of the new "facts" consist of allegations of false statements and threats made by Defendants. But the allegations contain no specific facts as to where, when, or to whom these statements were made, or even what the Defendants were supposed to have said. This Complaint still fails to plead valid causes of action, and we agree with the trial court that the amendment is futile.

The assertions made by Mr. Demers in his Complaint of August 7, 2002 and in his Amended Complaint of October 10, 2002 stand in sharp contrast with his sworn testimony in his divorce case as to the events that were occurring contemporaneously with the alleged transgressions of the defendants in this case. As part of the Marital Dissolution Agreement, which he executed in May of 1998, Mr. Demers agreed to pay Mrs. Demers 1.8 million dollars in settlement of all marital property interests. Between May of 1998 and the February 26, 2002 bench trial of his petition to reduce his child support, the events relative to the allegations of the case at bar occurred:

> On February 26, 2002, a bench trial was held on Father's petition. At the time of trial, Father was forty-three years old. Father testified on his own behalf. Father said that, by December 2000, Demers Inc. was heavily in debt due to the loans he took out against the company to pay Mother her $1.8 million settlement. In addition, he claimed that the advent of the internet negatively impacted his business because prospective clients could find available printing equipment, particularly in other countries, simply by using an internet search, obviating the need for an American printing press broker such as Demers Inc. Because of the decline in business and the interest he had to pay on the loan, Father "was not making the

money," and he said that he "was actually paying more child support than [he] was paying [himself]." On top of this, in approximately January 2001, Father was sued by Western Printing Company ("Western Printing") in South Dakota.

Father testified that, in June 2001, he held the auction to liquidate the company's assets, in order to pay off the company's debts with the proceeds. About an hour before the June 2001 auction, Father was served with an injunction from the Western Printing lawsuit, requiring him to pay all the proceeds of the auction into the local chancery court, to be held pending the outcome of the lawsuit. Father claimed that he was presented with the injunction in the presence of some very well-financed bidders, and that this had a chilling effect on the auction, causing it to be significantly less successful than he had anticipated.[3] Despite this, after the auction, Father was able to fully pay the debts of Demers Inc. After paying these debts, Father owned, free and clear, the $600,000 manufacturing facility out of which Demers Inc. had done business. At the time of trial, Father was actively trying to sell the facility.

Father testified that, since the June 2001 auction, he has not had any income. Father explained that after the auction, he spent the great majority of his time dealing with the South Dakota Western Printing lawsuit, which was finally resolved in his favor in February 2002, just prior to the trial on his child support petition. He claimed that his living expenses, including attorney's fees and child support, were being paid by the line of credit against his house that he obtained from Regions Bank. In addition, Father said, he sold some assets to meet his financial obligations. Father sold his larger BMW vehicle for $35,000 and bought an older model for $12,500. He also sold a Regal boat for $16,400. At the time of trial, Father had a Ferrari worth $55,000 that he was attempting to sell, but he also owned a sailboat worth $90,000 that he wanted to keep. Father acknowledged that he had other assets, including an antique printing press collection worth $50,000; a retirement account worth $70,000; an investment account worth $28,000; a race car worth $6,000; and $15,000 in a bank account in England.

. . . .

On cross-examination, Father acknowledged that his sister, who lives in Florida, began a business called Demers Parts, which was engaged in buying and selling printing press parts. Demers Parts had operated out of Father's building since early 2001, and paid no rent to Father for the use of the space. Father testified that his sister was not actually involved in the operation of Demers Parts, but that his brother was quite involved in the company. Prior to his work with Demers Parts, Father's brother had no experience in the printing press business. Father also

---

[3] Father claimed that he spent about $33,000 in printing advertisements for the auction, and he paid the auctioneer $35,000 for his efforts.

acknowledged that, at the June 2001 auction, he sold equipment with a street value of $150,000 to Demers Parts for $31,000.[4] He also admitted that, a few months after the auction, he sold a machine for $178,000, the proceeds of which went into Demers Parts. Father admitted to helping Demers Parts sell machines and parts, but he denied having been paid any money by the company for his services. Father said that his brother lives with him, paying no rent. Father also admitted that he sold a company van belonging to Demers Inc. for $8,500 and, using that money, bought his brother a $10,000 Mustang. Further, Father admitted to using the Demers Inc. charge card and checking account frequently for personal use, such as in payment for football season tickets, travel expenses, restaurant expenses, gasoline, and other expenses. In fact, between October 2000 and March 2001, Father spent $33,126 of Demers Inc. funds on travel and entertainment, including a trip to Italy. Father insisted that all of the trips were business related.

*Demers v. Demers*, No. M2002-01970-COA-R3-CV (Tenn.Ct.App. Dec. 10, 2003).

At that same hearing of February 20, 2002, Mrs. Demers testified:

She said that Father had great potential to continue his business. She noted that she and Father had closed down the business for a period of time in 1994, but that, when the business resumed, it was stronger than before. She asserted that Father is a "very bright individual" who "has the capacity to earn income." Mother also submitted the testimony of Demers Inc. former employee, Decker Davis ("Davis"). Davis stated that, in January 2001, Father "said he had too many lawsuits, and his ex-wife was suing him for, I guess, for child support, and he was closing the business down." Mother argued that Father closed Demers Inc. in order to avoid paying child support.

*Demers*, No. M2002-01970-COA-R3-CV (Tenn.Ct.App. Dec. 10, 2003).

The findings of fact of the trial court in the *Demers v. Demers* case were rendered March 28, 2002 and are devastating to Mr. Demers.

-Father closed his business in 2001 because the business had too much debt; through the liquidation, Father paid off the debts and owned a $600,000 manufacturing building clear of debt.

-Father claimed no income after the auction in June 2001, yet there was no decline in his lifestyle.

---

[4] Actually, Demers Parts paid Father only $21,000, and still owed him about $10,000 at the time of trial.

-After June 2001, Father purchased season tickets to the Nashville Kats, maintained his PSLs with the Titans, and has enjoyed trips abroad, which were charged through his business account.

-Father's claim that he had no income since June 2001 was not credible, because he was not earning income on his $600,000 building. Demers Parts occupied the building, but Father collected no rent from his sister.

-Demers Parts was essentially the same business Father was in, yet neither Father's sister nor his brother had expertise in the business.

-Father was at Demers Parts on a daily basis; it is incredulous that Father would work there but receive no income for his participation in the business, rental or otherwise.

-Though Father is not college educated, he has expertise, experience, training, background, and a history of business success. Based on his technical background and his experience, as well as his entrepreneurship, he has an ability which he is not currently utilizing.

-Father has deliberately chosen not to pursue jobs that utilize his abilities.

-Father stated to Decker Davis, a former employee, that his decision to go out of business was due, at least in part, to his child support obligation.

-Father used false advertising regarding his business and fictitious business names, which made his business relationship with his sister and brother even more suspect.[5]

-Father's brother lives with him, yet pays no rent.

-Father denies any knowledge regarding the capitalization his sister put into her business, yet she's conducting business out of the same business which he operates, and she is apparently not involved in her business on a daily basis.

-Father traded a business van to obtain a vehicle for his brother, and none of the proceeds were used for child support.

---

[5] Father admitted to publishing a "going out of business" advertisement in September 2000, when in fact Demers Inc. was not planning to go out of business at that time. Another advertisement was purchased calling the business Demers International, when that, in fact, was not the name of the company.

-Father sold parts from his business to his sister's new business at a favorable price and took a note for a portion of the purchase price.

-Father gave a financial statement to Regions Bank reporting a 401(k) plan of $70,000 and showing a salary of $125,000, both of which he testified were not quite correct.

-Father used the business charge card for considerable personal expense on extravagances, including a trip to Italy and a cruise.

-Father did not tell his accountant about the use of the business charge card for personal expenses.

-Father used the line of credit he obtained from Regions Bank to pay off shareholder debt to himself.

-Father exhibited a general lack of candor regarding his business affairs.

*Demers*, No. M2002-01970-COA-R3-CV (Dec. 10, 2003).

Conspicuously absent from the testimony of Mr. Demers in the child support reduction case are any of the allegations contained in the Complaint or the Amended Complaint in the case at bar. Likewise, conspicuously absent from the Complaint and Amended Complaint at bar is any allegation of any factual discoveries by Mr. Demers between his February 20, 2002 testimony in the child support case and his August 7, 2002 filing of the Complaint in the case at bar.

III.     DISMISSAL OF PLAINTIFF'S COMPLAINT AND AMENDED COMPLAINT

The original complaint, the amended complaint, and the voluminous documents filed with the amended complaint are couched in abstract generalities, conclusory allegations, and are short on specifics. While pleadings are liberally construed under the Tennessee Rules of Civil Procedure, the need for some degree of coherence has not been totally abandoned. Tenn. R. Civ. P. 8.01 still requires that the facts upon which a claim for relief is founded must be stated in the complaint. *W & O Construction Co. v. City of Smithville*, 557 S.W.2d 920 (Tenn. 1977). Since Tenn. R. Civ. P. rule 8.01and Fed. R. Civ. P. rule 8(a) are couched in identical language we may look to federal decisions in construing the Tennessee rule. *March v. Levine*, 115 S.W.3d 892 (Tenn.Ct.App. 2003).

Even in the face of an Fed. R. Civ. P. rule 12(b)(6) motion not converted to rule 56 status by extraneous documents, the complaint must meet at least minimal standards of coherence.

In the precincts patrolled by Rule 12(b)(6), the demands on the pleader are minimal. As we have recently stated, the court must

> accept the well-pleaded factual averments of the latest (second amended) complaint as true, and construe these facts in the light most flattering to the [plaintiff's] cause . . . exempt[ing], of course, those "facts" which have since been conclusively contradicted by [plaintiff's] concessions or otherwise, and likewise eschew[ing] any reliance on bald assertions, unsupportable conclusions, and "opprobrious epithets."

*Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert denied*, _____ U.S. _____, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987) (citations omitted). A Rule 12(b)(6) motion will be granted only if, when viewed in this manner, the pleading shows no set of facts which could entitle plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-48, 78 S.Ct. 99, 101-03, 2 L.Ed.2d 80 (1957). Nevertheless, minimal requirements are not tantamount to nonexistent requirements. The threshold may be low, but it is real–and it is the plaintiff's burden to take the step which brings his case safely into the next phase of the litigation. The court need not conjure up unpled allegations or contrive elaborately arcane scripts in order to carry the blushing bride through the portal.

In this case, the plaintiff pleaded no facts adequate to entitle him to offer evidence in support of his (entirely conclusory) assertions. And we need neither reinvent the wheel nor tarry long over his claims to the contrary. The district court has competently described the shortcomings of the second amended complaint and nothing would be gained by appellate reiteration of the pivotal points. Accordingly, the judgment of dismissal may be affirmed for substantially the reasons set forth in Judge Zobel's insightful opinion, 678 F.Supp. 939.

. . . .

Modern notions of "notice pleading" notwithstanding, a plaintiff, we think, is nonetheless required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory. We agree with the Seventh Circuit that if the facts narrated by the plaintiff "do not at least outline or adumbrate" a viable claim, his complaint cannot pass Rule 12(b)(6) muster. *Sutliff, Inc. v. Donovan Companies*, 727 F.2d 648, 654 (7th Cir. 1984). *See also Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983); *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978).

Appellant asks to be excused from even this minimal burden because of what he characterizes as "the underlying policy considerations" of the Petroleum Marketing Practices Act. Appellant's Brief at 21. But Gooley's view of these policy considerations is lopsided; there are two sides to the statutory story. Although we have long acknowledged the need to construe the PMPA liberally to effectuate its ultimate objective–the granting of some meaningful measure of protection to service

station franchisees–we have likewise borne in mind that the statute "constituted a diminution of prior rights of franchisors and thus should not be extended beyond [its] language and purpose." *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir. 1987) (citation omitted). Here, the allegation that Mobil's offer was other than bona fide was merely a subjective characterization, devoid of a minimally sufficient factual predicate. To permit a plaintiff, on such a skimpy foundation, to drag a defendant past the pleading threshold would be to invite litigation by hunch and to open gasoline franchisors–just because they are franchisors–to the most unrestrained of fishing expeditions. We decline to impose such an onerous burden. In sum, Count II of the second amended complaint cannot withstand scrutiny because it contains insufficient rudiments of an actionable claim.

*Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514-15 (1st Cir. 1988).

In a similar context, the court analyzed a complaint under the Sherman Antitrust Act which had been countered by an Fed. R. Civ. P. rule 12(b)(6) motion. Said the court:

> The issue turns as much on a recurring problem of civil procedure–what force is to be accorded conclusory terms in a complaint–as it does on antitrust analysis.
>
> The governing precept, to borrow the district court's excellent summary, is that while the plaintiff's "facts" must be accepted as alleged, this does not automatically extend to "[b]ald assertions, subjective characterizations and legal conclusions," 2 F.Supp.2d at 228 (citing cases); further, as the district judge said, "the factual allegations must be specific enough to justify 'drag[ging] a defendant past the pleading threshold,' " *id.* at 228 (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988)).
>
> *Gooley's* concept of "the pleading threshold" is critical. The complaint should include "a short and plain statement" of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a), so it need not include evidentiary detail. On the other hand, the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.

*DM Research v. College of American Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999).

We first must determine the proper standard of review for the trial court's decision to dismiss Plaintiff's Complaint. Although Defendants originally filed a Tennessee Rule of Civil Procedure 12.02(6) Motion to Dismiss, Plaintiff subsequently filed a Response which included additional affidavits. Plaintiff's reliance on these affidavits outside the pleadings converted the original Motion to Dismiss to a Motion for Summary Judgment. Further, even though the trial court considered this matter a Rule 12 Motion to Dismiss and made its decision based on that standard, our review of its decision will use the standard of review for a Rule 56 Motion for Summary Judgment. Such was

this Court's holding in a similar situation in the case of *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946 (Tenn.Ct.App. 1995).

In the *Eastern Pacific* case, plaintiff introduced two affidavits after the filing of his initial complaint and specifically requested the court to consider one of these affidavits in its opposition to a motion to dismiss. Said the court:

> Later papers filed in the trial court indicate that the trial court did not exclude the affidavit from consideration, and in fact, the trial court's final order states that its decision to grant the motion to dismiss was based on "the entire record in this cause."
>
> . . . .
>
> . . . The moving party generally triggers the conversion process by challenging the sufficiency of the pleader's complaint with materials not included in the pleadings; however, Tenn.R.Civ.P. 12.02 does not restrict the right to introduce extraneous materials to the moving party. The pleader may also bring about the conversion by submitting extraneous materials to oppose the motion to dismiss. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366, at 486-88 (2d ed. 1990) ("Federal Practice and Procedure").
>
> Trial courts have discretion to accept or exclude matters beyond the pleadings, Federal Practice and Procedure, *supra*, § 1366, at 491, and may prevent a conversion from taking place by declining to consider extraneous matters. 2A James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 12.09 [3], at 12-107 (2d ed. 1994) ("Moore's Federal Practice"). They must, however, convert a Tenn.R. Civ.P. 12.02(6) motion to dismiss to a motion for summary judgment if they do not exclude the extraneous evidence. *Hixson v. Stickley*, 493 S.W.2d 471, 473 (Tenn. 1973); *D.T. McCall & Sons v. Seagraves*, 796 S.W.2d 457, 459-60 (Tenn.Ct.App. 1990).
>
> Pacific Eastern made a tactical decision to oppose the motion to dismiss with two affidavits. The trial court did not exclude the affidavits from consideration and accordingly should have converted the motion to dismiss to a motion for summary judgment. Since the parties have not taken issue on appeal with the trial court's failure to convert the motion or with its consideration of the affidavit, they have waived their opportunity to take issue with these procedural errors.
>
> Notwithstanding the trial court's oversight, we will review its decision to grant the motion to dismiss using the standard of review for Tenn.R.Civ.P. 56 motions. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 284 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir. 1991); Moore's Federal Practice, *supra*, ¶

12.09[3]. Accordingly, our task is to determine whether Tenn.R.Civ.P. 56's requirements have been met. *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991); *Mansfield v. Colonial Freight Sys.*, 862 S.W.2d 527, 530 (Tenn.Ct.App. 1993).

*Pacific Eastern Corp.*, 902 S.W.2d at 951-52.

Defendants pointed out numerous deficiencies in Plaintiff's pleadings in their Rule 12.02(6) motions. In response, Plaintiff provided "evidence" in the form of two sworn affidavits to be considered by the trial court. Once this additional evidence outside of the initial pleadings was presented, the job of the trial court, and our job, became to take the strongest legitimate view of the *evidence* in favor of Plaintiff and determine if there is a dispute as to any material fact or doubt as to the conclusions to be drawn from the facts under Tennessee Rule of Civil Procedure 56.

The trial court dismissed all allegations against Defendant Karen Demers finding that the statute of limitations had expired on any claim against her. We agree with this determination. The only specific fact alleged against Karen Demers was a statement made on May 22, 2001 that "Kevin has a way of closing down businesses to avoid law suits and creditors as he has done it before." The Complaint against Ms. Demers was not filed until August 7, 2002, over a year after the alleged defamatory statement. The statute of limitations "for slanderous words spoken" is six months in Tennessee. Tenn.CodeAnn. § 28-3-103. Any lawsuit for damages caused by this statement is clearly untimely.

The remainder of the "facts" alleged by Plaintiff consists of legal conclusions with regard to Plaintiff's action and of unsubstantiated allegations of actions and conspiracies committed by Defendant Karen Demers, with no claim of how Plaintiff had personal knowledge of these acts and conspiracies. Plaintiff failed to present one shred of evidence that any of the actions alleged to have been performed by Ms. Demers ever actually happened. In order to survive a motion for summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party, the same standards used in evaluating a motion for directed verdict. . . . 'There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.' " *Byrd v. Hall*, 847 S.W.2d 208, 212 (Tenn. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In that same case, the Tennessee Supreme Court also adopted the ruling in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 213 (quoting *Celotex*, 477 U.S. at 321). With regard to any other allegations against Ms. Demers, no evidence at all was presented.

Likewise, with regard to Walter Whittenburg, Whittenburg, Inc., and James Qualls, the trial court found that the Complaint failed to state a claim for which relief could be granted and dismissed all claims against these Defendants. We uphold the trial court's decision to dismiss the claims against these Defendants, but do so on a summary judgment standard.

As with Ms. Demer's Motion to Dismiss, Plaintiff attached an affidavit in response to the Motion to Dismiss filed by remaining Defendants, converting their Motion to Dismiss into a Motion for Summary Judgment. Once again, Plaintiff made numerous unsubstantiated accusations and allegations against Defendants, but fails to provide any evidence of wrongdoing by Defendants or state his first hand knowledge of their actions. There are numerous allegations of statements made by Defendants and allegations of contact that Defendants had with Plaintiff's customers. However, Plaintiff fails to provide any evidence that these actions ever occurred either through a statement of his first hand knowledge of the actions or statements of those who were a witness or a party to the alleged occurrences. "Rule 56.05 provides that the nonmoving party 'may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or [otherwise], must set forth specific facts showing that there is a genuine issue for trial.' " *Byrd*, 847 S.W.2d at 210. "Furthermore, the facts on which the nonmoving party relies must be admissible in evidence. *Price v. Becker*, 812 S.W.2d 597 (Tenn.App. 1991)." *Braswell v. Carothers*, 863 S.W.2d 722, 729 (Tenn.Ct.App. 1993).

Under a summary judgment standard, we fail to find enough evidence to raise any genuine issue of material fact with regard to allegations made against Defendants Walter Whittenburg, Whittenburg, Inc., and James Qualls. Plaintiff failed to present any evidence on which a jury could return a verdict for Plaintiff on any cause of action alleged against these Defendants.

IV.    SANCTIONS

Ms. Demers also filed a Motion for Sanctions against Plaintiff, which was granted by the trial court. The trial court stated that this was not a case in which reasonable parties could disagree regarding the application of the statute of limitations. Due to the obvious groundless nature of Plaintiff's suit against Ms. Demers, we affirm the trial court's grant of sanctions and attorney's fees against Plaintiff.

The judgment of the trial court is in all respects affirmed and the case remanded to the Circuit Court of Robertson County for such further proceedings as may be necessary. Costs are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE

-20-