IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2003 Session

**KEVIN STANLEY DEMERS**
**v.**
**KAREN ANNETTE WALLACE DEMERS**

**An Appeal from the Circuit Court for Robertson County**
**No. 8683     Ross H. Hicks, Judge**

**No. M2002-01970-COA-R3-CV - Filed December 10, 2003**

This involves a post-divorce petition to reduce child support. The mother and father were divorced in 1998, and the mother was awarded custody of the parties' three children. The father was ordered to pay child support plus private school tuition, based on substantial annual earnings from self-employment. In December 2000, the father filed a petition to have his child support payments reduced based on a decline in his business. The father later liquidated the assets of his business and quit work. He subsequently amended his petition, asserting that he had earned no income since the liquidation of his business. After a bench trial, the trial court rejected the father's petition for a reduction in child support, finding that the father was willfully underemployed. The father now appeals. We affirm, finding that the evidence does not preponderate against the trial court's determination that the father was willfully underemployed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Troy Lee Brooks, Mount Juliet, Tennessee, for the appellant, Kevin Stanley Demers.

Gregory D. Smith, Nashville, Tennessee, for the appellee, Karen Annette Wallace Demers.

**OPINION**

Petitioner/Appellant Kevin Stanley Demers ("Father") and Respondent/Appellee Karen Annette Wallace Demers ("Mother") were married in 1986 and had three children during their marriage. Soon after Father and Mother married, they formed Demers, Inc. ("Demers Inc."), which bought and sold printing presses. Father had worked in the printing press industry since he graduated from high school, and he never attended college. Father controlled the company's operations, and Mother worked in the accounting aspect of the business. The company was quite successful. There

were only approximately five printing press companies in the country of a size and scope similar to Demers Inc., although there were hundreds of similar businesses that were considerably smaller.

The parties divorced in May 1998. Not surprisingly, prior to that, Mother had ceased working with Demers Inc. Although Father's income from Demers Inc. varied from year to year, for purposes of setting child support, his annual income was determined to be $250,000.[1] In the martial dissolution agreement signed by the parties, Father retained the business and paid Mother a total of $1.8 million as a property settlement. Father sold some of his assets and took out a $1.3 million loan against the company in order to pay Mother the $1.8 million within the required time limitations. In the divorce decree, Mother was awarded custody of the parties' children (ages fourteen, twelve, and nine at the time of trial), and Father was ordered to pay monthly child support of $4,100 under the guidelines, plus $1,250 per month for the children's private school education. Father was also required to provide medical insurance and maintain life insurance.

In 1999 and 2000, the business declined substantially. On December 12, 2000, Father filed a petition pursuant to Tennessee Code Annotated § 36-5-101(a)(1) to reduce his monthly child support payments. In his petition, he alleged that a reduction in support was necessary because of a "reduction in business due to market circumstances beyond his control." In June 2001, Father held an auction and sold most of the company's assets at discounted prices. After the auction, Father ceased working. On February 20, 2002, Father filed an amended petition stating that he had earned no income since the June 2001 auction, and that his living expenses were funded by a line of credit from Region's Bank. Father sought to reduce his monthly support payments from $5,350 ($4,100 plus $1,250 tuition) to a total of $1,272, consistent with an earning capacity of $50,000 per year. Father alleged that his earning capacity was severely diminished by the necessary auction of the assets of Demers Inc. In May 2001, pending the trial court's decision on his petition, Father unilaterally reduced the child support payments to his proposed amount.

On February 26, 2002, a bench trial was held on Father's petition. At the time of trial, Father was forty-three old. Father testified on his own behalf. Father said that, by December 2000, Demers Inc. was heavily in debt due to the loans he took out against the company to pay Mother her $1.8 million settlement. In addition, he claimed that the advent of the internet negatively impacted his business because prospective clients could find available printing equipment, particularly in other countries, simply by using an internet search, obviating the need for an American printing press broker such as Demers Inc. Because of the decline in business and the interest he had to pay on the loan, Father "was not making the money," and he said that he "was actually paying more child support than [he] was paying [himself]." On top of this, in approximately January 2001, Father was sued by Western Printing Company ("Western Printing") in South Dakota.

---

[1]Because Father's income was dependent on the success of the business, his annual income varied from year to year. The trial court below did not permit the parties to submit evidence regarding how Father's annual income was determined to be $250,000 for purposes of setting child support in the divorce action. Nevertheless, it is generally accepted by both parties that Father's support obligations in the divorce decree were based on that amount of income.

Father testified that, in June 2001, he held the auction to liquidate the company's assets, in order to pay off the company's debts with the proceeds. About an hour before the June 2001 auction, Father was served with an injunction from the Western Printing lawsuit, requiring him to pay all the proceeds of the auction into the local chancery court, to be held pending the outcome of the lawsuit. Father claimed that he was presented with the injunction in the presence of some very well-financed bidders, and that this had a chilling effect on the auction, causing it to be significantly less successful than he had anticipated.[2] Despite this, after the auction, Father was able to fully pay the debts of Demers Inc. After paying these debts, Father owned, free and clear, the $600,000 manufacturing facility out of which Demers Inc. had done business. At the time of trial, Father was actively trying to sell the facility.

Father testified that, since the June 2001 auction, he has not had any income. Father explained that after the auction, he spent the great majority of his time dealing with the South Dakota Western Printing lawsuit, which was finally resolved in his favor in February 2002, just prior to the trial on his child support petition. He claimed that his living expenses, including attorney's fees and child support, were being paid by the line of credit against his house that he obtained from Regions Bank. In addition, Father said, he sold some assets to meet his financial obligations. Father sold his larger BMW vehicle for $35,000 and bought an older model for $12,500. He also sold a Regal boat for $16,400. At the time of trial, Father had a Ferrari worth $55,000 that he was attempting to sell, but he also owned a sailboat worth $90,000 that he wanted to keep. Father acknowledged that he had other assets, including an antique printing press collection worth $50,000; a retirement account worth $70,000; an investment account worth $28,000; a race car worth $6,000; and $15,000 in a bank account in England.

When asked about his plans for future employment, Father testified that he had made a commitment to start a parts manufacturing business, but said that it would take two to three years to develop. He said that no other company in the area would hire him because he was overqualified and he might learn their business and compete. Father stated that he was willing to work, but that he did not know of any other position that would earn him the $250,000 annual income on which the original child support award was based. He maintained that he did not liquidate Demers Inc. in order to avoid paying child support.

On cross-examination, Father acknowledged that his sister, who lives in Florida, began a business called Demers Parts, which was engaged in buying and selling printing press parts. Demers Parts had operated out of Father's building since early 2001, and paid no rent to Father for the use of the space. Father testified that his sister was not actually involved in the operation of Demers Parts, but that his brother was quite involved in the company. Prior to his work with Demers Parts, Father's brother had no experience in the printing press business. Father also acknowledged that, at the June 2001 auction, he sold equipment with a street value of $150,000, to Demers Parts for

---

[2]Father claimed that he spent about $33,000 in printing advertisements for the auction, and he paid the auctioneer $35,000 for his efforts.

$31,000.[3]  He also admitted that, a few months after the auction, he sold a machine for $178,000, the proceeds of which went into Demers Parts.  Father admitted to helping Demers Parts sell machines and parts, but he denied having been paid any money by the company for his services. Father said that his brother lives with him, paying no rent.  Father also admitted that he sold a company van belonging to Demers Inc. for $8,500 and, using that money, bought his brother a $10,000 Mustang.  Further, Father admitted to using the Demers Inc. charge card and checking account frequently for personal use, such as in payment for football season tickets, travel expenses, restaurant expenses, gasoline, and other expenses.  In fact, between October 2000 and March 2001, Father spent $33,126 of Demers Inc. funds on travel and entertainment, including a trip to Italy. Father insisted that all of the trips were business related.

Father's accountant, George Shick ("Shick"), also testified at trial.  Shick said that Father hired him to assist in gathering the funds to pay Mother the $1.8 million settlement in the MDA. Shick said that this took about a year.  To accomplish that goal, Shick noted, Father sold his home and purchased a much less expensive one, and took out the $1.3 million loan against Demers Inc. Shick estimated that Father's post-settlement net worth was approximately $1.3 to $1.4 million, though he had a significant amount of debt and not much liquidity.

By December 1999, Shick stated, Demers Inc. had maxed out its $1.3 million line of credit, and the business declined.  In the fall of 2000, when it appeared that Father's business was in violation of loan covenants to the banks that had extended him lines of credit, Shick recommended to Father that he close down his business.  Shick testified that he was present at the June 2001 auction of the assets of Demers Inc.  Shick said that when Father was presented with the injunction from the South Dakota Western Printing lawsuit, on the morning of the auction, Father was visibly upset.  He stated that after bidders witnessed the injunction being served on Father, only six or seven bidders out of the thirty-two bidders that were present actively bid on the machines.  Shick believed that this was unusual, in light of the fact that the bidders had traveled to the auction from places such as Columbia, Mexico, New York, California, and Colorado, and he surmised that their reluctance to bid was because of the injunction.  He said that Father received only $8,500 cash from the auction, and the rest of the proceeds went directly to the bank to satisfy the debt of the company.[4]  Shick opined that Father could not continue to earn $250,000 annual income from "the present business model of Demers, Inc.," because he could no longer obtain the necessary financial resources to maintain inventory.

Shick said that he recommended to Father that he file a petition to reduce his child support payments.  Shick said that Father had not, to his knowledge, received any compensation from Demers Parts.  Shick was unaware that Father had been using the Demers Inc. credit card to charge personal expenses.

---

[3] Actually, Demers Parts paid Father only $21,000, and still owed him about $10,000 at the time of trial.

[4] That amount was being held by the court in the Western Printing lawsuit in South Dakota pending the outcome of the case.  When that lawsuit concluded in favor of Demers Inc., the court released the money to Father.

Mother also testified at trial. She said that Father had great potential to continue his business. She noted that she and Father had closed down the business for a period of time in 1994, but that, when the business resumed, it was stronger than before. She asserted that Father is a "very bright individual" who "has the capacity to earn income." Mother also submitted the testimony of a Demers Inc. former employee, Decker Davis ("Davis"). Davis stated that, in January 2001, Father "said he had too many lawsuits, and his ex-wife was suing him for, I guess, for child support, and he was closing the business down." Mother argued that Father closed Demers Inc. in order to avoid paying child support.

On March 28, 2002, the trial court made oral findings of fact and conclusions of law. The trial court determined that, while Father's income had declined by a significant amount, he was willfully underemployed and, therefore, was not entitled to a reduction in child support. The trial court specifically held that Father was "capable of maintaining his Court-ordered level of support." In determining that Father was willfully underemployed, the trial court found the following factors to be significant:

- Father closed his business in 2001 because the business had too much debt; through the liquidation, Father paid off the debts and owned a $600,000 manufacturing building clear of debt.

- Father claimed no income after the auction in June 2001, yet there was no decline in his lifestyle.

- After June 2001, Father purchased season tickets to the Nashville Kats, maintained his PSLs with the Titans, and has enjoyed trips abroad, which were charged through his business account.

- Father's claim that he had no income since June 2001 was not credible, because he was not earning income on his $600,000 building. Demers Parts occupied the building, but Father collected no rent from his sister.

- Demers Parts was essentially the same business Father was in, yet neither Father's sister nor his brother had expertise in the business.

- Father was at Demers Parts on a daily basis; it is incredulous that Father would work there but receive no income for his participation in the business, rental or otherwise.

- Though Father is not college educated, he has expertise, experience, training, background, and a history of business success. Based on his technical background and his experience, as well as his entrepreneurship, he has an ability which he is not currently utilizing.

– Father has deliberately chosen not to pursue jobs that utilize his abilities.

– Father stated to Decker Davis, a former employee, that his decision to go out of business was due, at least in part, to his child support obligation.

– Father used false advertising regarding his business and fictitious business names, which made his business relationship with his sister and brother even more suspect.[5]

– Father's brother lives with him, yet pays no rent.

– Father denies any knowledge regarding the capitalization his sister put into her business, yet she's conducting business out of the same business which he operates, and she is apparently not involved in her business on a daily basis.

– Father traded a business van to obtain a vehicle for his brother, and none of the proceeds were used for child support.

– Father sold parts from his business to his sister's new business at a favorable price and took a note for a portion of the purchase price.

– Father gave a financial statement to Regions Bank reporting a 401(k) plan of $70,000 and showing a salary of $125,000, both of which he testified were not quite correct.

– Father used the business charge card for considerable personal expense on extravagances, including a trip to Italy and a cruise.

– Father did not tell his accountant about the use of the business charge card for personal expenses.

– Father used the line of credit he obtained from Regions Bank to pay off shareholder debt to himself.

– Father exhibited a general lack of candor regarding his business affairs.

Considering those circumstances, the trial court discredited Father's testimony and determined that he was willfully underemployed and, therefore, not entitled to a reduction in support. On April 3, 2002, the trial court entered a written order consistent with its oral ruling. In that order, the trial

---

[5]Father admitted to publishing a "going out of business" advertisement in September 2000, when in fact Demers Inc. was not planning to go out of business at that time. Another advertisement was purchased calling the business Demers International, when that, in fact, was not the name of the company.

court awarded Mother $35,738 for past due child support, which was the amount Father owed from his unilateral reduction in payments beginning in May 2001. Furthermore, the trial court awarded Mother $11,908.15 in fees and litigation costs, making a total damage award of $47,646.15.

On May 2, 2002, Father filed a timely motion to alter or amend the judgment. On June 23, 2002, the court conducted a hearing on the motion. At the close of that hearing, the trial court declined to modify its previous ruling and reiterated that Father's decline in income was "both overstated and exaggerated and, more importantly, that [Father] had the ability to have maintained the income, and that he was deliberately, by choice, underemployed." The trial court again indicated that it did not find Father "to be particularly credible in a number of issues." On August 7, 2002, the trial court entered an order denying the motion to alter or amend. From that order, Father now appeals.

On appeal, Father argues that the trial court erred in denying the petition to reduce his child support payments. First, Father asserts that the trial court was required under Tennessee Code Annotated § 36-5-101(a)(1) to reduce his child support payments, because the trial court is obliged to decrease payments when a significant variance is shown. Next, Father argues that the trial court's finding that Father was underemployed constituted reversible error, because the court impermissibly imputed income to him based on his "opulent" lifestyle and on the capital gains from the sale of marital assets. Finally, Father argues that the evidence preponderates against the trial court's conclusion that he was willfully underemployed.

We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. ***Huntley v. Huntley***, 61 S.W.3d 329, 334 (Tenn. Ct. App. 1991). We review the trial court's conclusions of law *de novo*, with no such presumption of correctness. ***Id.***

The standard for determining whether an existing child support order should be modified is the "significant variance test," set forth in Tennessee Code Annotated § 36-5-101(a)(1), which provides:

> . . . In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered unless the variance has resulted from a previously court-ordered deviation from the guidelines and the circumstances which caused the deviation have not changed.

Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 2003); ***see Turner v. Turner***, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995). Thus, in order to obtain a decrease in child support, the obligor parent must

show a "significant variance", or a difference of 15%,[6] between the guidelines and the amount of support currently ordered. *Id.*; Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3); *see Coates v. Coates*, No. M2001-01928-COA-R3-CV, 2002 WL 31528512, at *2 (Tenn. Ct. App. Nov. 15, 2002). As noted by Father, the statute provides that, where a "significant variance" exists, the trial court <u>shall</u> increase or decrease the support award accordingly. Under some circumstances, however, the trial court may use the obligor parent's *potential* income, or earning capacity, for purposes of determining whether a significant variance exists. *See Brooks v. Brooks*, 992 S.W.2d 403, 407 (Tenn. 1999).

The first step in determining whether a significant variance exists is determining the obligor's actual or potential income to which the child support guidelines formula will be applied. *See Eatherly v. Eatherly*, No. M2002-00886-COA-R3-CV, 2001 WL 468665, at *3 (Tenn. Ct. App. May 4, 2001). Potential income, rather than actual income, can be used in making this determination when the obligor "has chosen to pursue an occupation or business venture which produces substantially less income than the parent is capable of earning." *Id.* at *4. Under those circumstances, the trial court is authorized to impute income to an obligor pursuant to the following regulation:

> If an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience.

Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(d). Thus, if application of the guidelines to the potential income of the obligor would result in a support award that equals, or is within 15% of, the current support award, then a decrease of support is not required under the statute. *See Anness v. Chapdelaine*, No. M2000-01792-COA-R3-CV, 2001 WL 1077959, at *2 (Tenn. Ct. App. Sept. 14, 2001). In the instant case, the trial court concluded that Father was willfully underemployed, and that he was "capable of maintaining his Court-ordered level of support." Because the trial court found that application of the guidelines to Father's potential income would result in the same support award as that previously ordered, then there is no "significant variance," and a decrease in the child support award was not mandated.

The real issue is whether the evidence preponderates against the trial court's conclusion that Father was willfully underemployed. Whether an obligor is willfully unemployed or underemployed depends on the factual background of each case. *See Anness*, 2001 WL 1077959, at *3. Such a determination is a question of fact, in which the trial court has considerable discretion. *Willis v.*

---

[6]The applicable regulation provides:

> [A] significant variance shall be at least 15% if the current support is one hundred dollars ($100.00) or greater per month . . . . Such variance would justify the modification of a child support order . . . . Upon a petition for adjustment by either party, the court shall increase or decrease the award amount as appropriate in accordance with these guidelines. . . ."

Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3).

***Willis***, 62 S.W.2d 735, 738 (Tenn. Ct. App. 2001). The burden is on the custodial parent to show that the obligor parent is willfully and voluntarily underemployed. ***Eatherly,*** 2001 WL 468665, at *11. The trial court must consider the obligor parent's past and present employment and determine whether the decision to take the lower paying job was made in good faith. ***Willis***, 62 S.W.3d at 738. When a party voluntarily leaves his employment to accept a lower paying position, "courts are inclined to find willful and voluntary underemployment." ***Id.*** "As with any other finding, a finding of underemployment must be supported by evidence in the record." ***Eatherly***, 2001 WL 468665, at *11.

Father argues that the trial court erred by basing its finding of willful underemployment on the fact that Father lead an "opulent" lifestyle and suffered no change in lifestyle since the original child support order was issued.[7] Father cites ***Alexander v. Alexander***, 34 S.W.3d 456 (Tenn. Ct. App. 2000), in which the mother custodial parent petitioned the court to increase the child support payments of the obligor father based on, among other things, the father's opulent lifestyle. ***See Alexander***, 34 S.W.3d at 458-59. The father owned shares of valuable stock in his grandfather's corporation (which produces Little Debbie Snack Cakes), which he sold from time to time as the need arose. Consequently, the father was able to lead an opulent lifestyle, in that he traveled extensively and owned a sailboat, a motor home, and stock worth over $420,000. ***Id.*** at 466. In arguing that the father's lifestyle required an increase in child support, the mother relied on the following regulation:

> Valuable assets and resources (expensive home or automobile which seem inappropriate for the income claimed by the obligor) of the obligor should be considered for the purpose of imputing income and increasing the support award in any case if the court finds that equity requires it.

Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(1)(f). The appellate court rejected the mother's argument, however, because the father's lifestyle was consistent with his income "when viewed in the context of his net worth and station in life." ***Alexander***, 34 S.W.3d at 466. The court explained that "[t]his is not a case where a court is required to impute income to an obligor. There is no secret wealth in this case. Father's wealth is very evident. He lives the way he does because he is relatively wealthy and can afford to live that way." ***Id.***

Father argues that this case is factually similar, and that the reasoning of the court in ***Alexander*** supports his argument that imputing income to him based on his opulent lifestyle was impermissible. He points out that there was no finding of secret wealth, and his lifestyle is consistent with his net worth and station in life. Father argues that the trial court's ruling emphasized that there was no decline in Father's lifestyle, and that he continued to purchase professional sports tickets and

---

[7]Father initially claims that the evidence preponderates against the trial court's conclusion that Father lead an extravagant lifestyle, because the majority of his previously owned luxury items were liquidated to pay child support and attorney's fees in connection with the Western Printing lawsuit. In light of our conclusion herein, it is not necessary for us to address this argument.

enjoy trips abroad. Because the trial court was not permitted to rely on this factor in imputing income to him, Father argues, the trial court's finding of willful underemployment must be reversed.

In this case, however, it does not appear that the trial court imputed income to Father based on his lifestyle.[8] By pointing out that Father enjoyed luxuries such as travel, sailing, and expensive sports events, the trial court was supporting its conclusion that Father's claimed decline in income was not credible, and that it "was both overstated and exaggerated." Such a credibility determination is given considerable deference by this court, "and we routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary." *Scott v. Scott*, No. M1999-00322-COA-R3-CV, 2001 WL 266038, at *4 (Tenn. Ct. App. Mar. 20, 2001); *Huntley*, 61 S.W.3d at 337. In explaining its ultimate conclusion that Father "was deliberately, by choice, underemployed," the trial court stated that Father "has expertise, experience, training, background, and a history of business success. It's true that he's not college-educated. But based on his technical background and his experience, as well as his entrepreneurship, it's apparent that he has an ability which he is not currently utilizing." Thus, while the trial court noted Father's lifestyle in making its decision, it did not impute income to Father based primarily on that factor.

Similarly, Father argues that the trial court impermissibly based its imputation of income on the sale proceeds of marital assets, again relying on *Alexander*. He argues that he maintained some semblance of his pre-divorce lifestyle only by liquidating much of his property and taking out loans and advances on his credit cards. Such capital gains, Father argues, may not be used for the purpose of considering or calculating child support.

Generally, capital gains are included within the meaning of gross income in the child support guidelines. *Alexander*, 34 S.W.3d at 462. However, "a capital gain resulting from a sale of an asset to fund a division of property in a divorce should not be considered in calculating child support. Such a rule prevents 'double-dipping.' " *Id.* at 464. In this case, however, the record does not indicate that the trial court relied on proceeds from the sale of marital assets used to fund the parties' property division in imputing income to Father. Rather, this decision was based on the finding of willful underemployment. Therefore, this argument is without merit.

Finally, Father argues that the evidence preponderates against the trial court's ultimate conclusion that he was willfully underemployed. Father claims that the undisputed evidence shows, and the trial court determined as a matter of fact, that his business declined between 1999 and 2001. Because of that decline and increased competition from internet business, he argues, he was forced to liquidate the company's assets; he did not liquidate his business in order to avoid making child support payments. Furthermore, Father argues, the fact that he had to sell assets shows that his lifestyle had changed significantly. Father points out that he sold his home, his boat, and his car to pay child support and attorney's fees. Father claims that the trial court attributed undue significance to Decker Davis's testimony that Father sold the business to avoid paying child support, because

---

[8] The trial court was, however, authorized to consider Father's assets and resources for purposes of imputing income to him. *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(1)(f).

after Davis left Demers Inc., he became a direct competitor. Father also asserts that the undisputed evidence shows that he was unable to find other employment after the auction, because he spent most of his time until February 2002 vigorously defending himself in the Western Printing litigation in South Dakota. Furthermore, Father asserts, he has only a high school education, with no other formal training or education, and his vocation is not widely marketable in the industry. In addition, Father claims, the evidence showed that he could not start up an equivalent business, because he no longer has the financial resources to get a significant line of credit. Therefore, because the sale of his business was made in good faith, and because he is unable to find a job paying him as much as he was earning at the time of the divorce, he argues that he is not willfully underemployed.

As noted above, determining whether an obligor parent is willfully underemployed "is a fact-driven inquiry requiring careful consideration of all the attendant circumstances." *Scott*, 2001 WL 266038, at *3. In making such a determination, "the Court is required to consider the obligor's education and prior work experience." *Brooks*, 992 S.W.2d at 407; *Willis*, 62 S.W.3d at 738. In addition, the Court considers the parent obligor's reason for accepting the lower paying position to determine whether the decision was made in good faith. *Eatherly*, 2001 WL 468665, at *11. "[O]bligor parents should not be permitted to avoid their child support obligations by liquidating their businesses, by quitting work, or by taking lower paying jobs. . . . Accordingly, the courts must scrutinize the reasons for the obligor parent's career decision . . . and the reasonableness of his or her ultimate career choice." *Scott*, 2001 WL 266038, at *3 (citations omitted).

In this case, the evidence was not strong that Father's decision to close Demers Inc. and sell the assets was to avoid paying child support, despite the testimony of Decker Davis. Father's testimony about the circumstances leading to the decision, including the South Dakota lawsuit, were essentially unrefuted. On the other hand, the trial court had ample evidence on which to base its finding that Father's claim of no income since the auction was not credible. Father asserted that his brother and sister, with no prior experience in the printing press industry, ran Demers Parts out of Father's building at no charge, and that Father was involved in the business but derived no income from it. Moreover, Father claimed that he maintained essentially the same lifestyle by selling assets, but claimed he had no income from which to pay the court-ordered child support. Under these circumstances, the trial court was entitled to disbelieve Father's assertion that he had no income since the auction of the assets of Demers Inc.

Moreover, Father's testimony on his efforts to find other employment or business ventures indicated that, until shortly before the trial in this cause, Father's time was taken up primarily by defending the Western Printing litigation in South Dakota; there was scant testimony about his efforts to secure another position or venture. Father claims that he cannot find desirable employment because he has only a high school education, he is not trained in any other industry, and the opportunities in his field are very limited. When asked about his efforts to obtain employment, Father replied that he planned to start a parts manufacturing business, but offered no details about that prospective business. The record is devoid of evidence that Father has taken any affirmative steps to find regular employment. Under these circumstances, we cannot find that the evidence preponderates against the trial court's determination that Father has the skills and experience to

enable him to work in his field, but that he is not utilizing his abilities. Accordingly, we affirm the trial court's conclusion that Father is willfully underemployed.

Mother asserts that Father's appeal is frivolous and seeks fees and costs on appeal. We do not consider Father's appeal to have been frivolous, and the original property division indicates that Mother has sufficient funds to pay her attorney's fees. Therefore, this request is denied.

We affirm the decision of the trial court. Costs are to be assessed to Appellant Kevin Stanley Demers, and his surety, for which execution may issue, if necessary.

 

_____
HOLLY M. KIRBY, JUDGE