# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 7, 2010 Session

## JULIE ANN KENDLE v. MATTHEW DAVIS KENDLE

**Appeal from the Circuit Court for Wilson County**
**No. 5774DVC      Clara Byrd, Judge**

---

**No. M2010-00757-COA-R3-CV - Filed April 28, 2011**

---

In this post-divorce proceeding, the father of the parties' child seeks to reduce his child support obligation due to a decrease in his income, and each parent alleges the other is in contempt for various reasons. The trial court denied Father's petition to reduce child support upon finding that Father was voluntarily underemployed. The trial court granted Mother's petition to hold Father in contempt for failing to comply with the parenting plan and denied Father's petition against Mother. Mother was awarded one-half of her attorney fees. Father appealed. We reverse the finding that Father was voluntarily underemployed and remand with instructions for the trial court to determine whether a significant variance exists in Father's child support obligation based on his actual income without additional imputed income. If a significant variance exists, the trial court is to set Father's child support obligation pursuant to the Guidelines. We also reverse the court's finding that Father was in contempt, because the trial court did not specify a provision of the parenting plan Father allegedly violated and the evidence is insufficient to establish that any violation was willful.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Reversed in Part, and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Tim W. Smith, Murfreesboro, Tennessee, for the appellant, Matthew Davis Kendle.

Gloria Jean Evins, Lebanon, Tennessee, for the appellee, Julie Ann Kendle.

# OPINION

Julie Ann Kendle ("Mother") and Matthew Davis Kendle ("Father") were married on November 13, 2004. During their marriage, they lived in Mount Juliet, Tennessee, and had one minor child, Abigail Rose, who was born in June 2006.

The parties divorced on August 8, 2007. The Final Decree of Divorce included a parenting plan wherein Mother was designated the primary residential parent, and Father was given 110 days of visitation annually. The visitation schedule was complex due to the fact Father is a fireman with the Wilson County Fire Department and his work schedule varies greatly. The parties were given joint decision-making authority over the child.

Father was required to pay $398 in child support per month, which was calculated using Mother's income as a graphic designer and Father's salary from the Wilson County Fire Department as well as supplemental income he earned from his lawn mowing business. Father was required to provide health insurance for the child, and the parties equally shared uncovered medical expenses. Both parties were also required to maintain a $250,000 life insurance policy for the benefit of the child that named the other party as the beneficiary trustee of the death benefits.

The parenting plan also provided that, "Neither party shall have overnight guests of the opposite sex to whom he or she is not married while the child is in his or her custody," and that the parties would resolve any disputes through mediation.

Following the divorce, Mother continued to live in Mount Juliet, and Father resided with his parents in Franklin, Tennessee. Because Father did not yet have a permanent residence, the parenting plan required Father to provide transportation for the child to and from visitation at his parents' home. The parenting plan also provided that when Father established a residence, Mother would begin picking the child up after Father's visits.

In January 2008, Father moved to Murfreesboro, Tennessee where he rented an apartment with his girlfriend, Julie Ashe. On January 8, 2008, Mother filed a motion in the Wilson County Circuit Court, asking the court to order Father to participate in mediation as required by the parenting plan to resolve transportation issues which arose after Father moved to Murfreesboro. Following mediation, the parties entered an agreed order on February 19, 2008, which provided that Mother would drop the child off for Father's visits at Father's apartment in Murfreesboro.

On March 24, 2009, Father filed a petition requesting additional visitation and a reduction in his child support obligations. He alleged that he was entitled to the reduction of

child support because his income from the lawn care business had greatly diminished. He also alleged that Mother was "co-habitating with a member of the opposite sex to which she is not married" and refusing to cooperate with him in carrying out the parenting plan. He then filed a motion seeking to find Mother in criminal contempt based on these same allegations.

Mother responded by filing her own Petition for Contempt against Father on August 21, 2009, alleging that he failed to comply with the parenting plan. Specifically, she alleged that Father violated the prohibition against overnight guests when he purchased a home with Ms. Ashe and lived with her out of wedlock. Mother also alleged that he was in contempt for failing to maintain the required life insurance coverage, that he only had insurance for death occurring on the job, and by failing to reimburse Mother $153.00 for his share of the child's medical expenses.

Mother also petitioned the court to make several modifications to the parenting plan, including that the court designate a public place where the parties would meet to exchange the child for visitation, that Mother be given sole decision-making authority over the child, and that Mother be awarded retroactive and future payments for child care expenses incurred from the child's participation in Mother's Day Out and preschool. She also requested a reduction in Father's visitation, an increase in his child support payments, and that she be allowed to provide health insurance for the child to eliminate the problem of Father failing to reimburse her for medical expenses. Mother later requested that her maiden name be restored and that her maiden name be added to the child's last name.

A bench trial was held on February 4, 2010. Three witnesses testified: Mother, Father, and Julie Ashe, whom Father had married three months earlier, on November 5, 2009. The trial court found that Father was not entitled to a reduction in his child support obligations because he was "voluntarily underemployed" and came to court with "unclean hands." The court attributed the diminished income from Father's lawncare business to the fact that he moved away from Mount Juliet, where his client base was primarily located. The court also found Father's contempt petition against Mother was frivolous, because he did not produce any proof for his allegations.

As for Mother's claims, the trial court found Father in civil contempt for violating the prohibition on overnight guests of the opposite sex while the child was in his custody. The court granted Mother's requests to designate a public place for the parties to exchange the child for visitation, allowed Mother to provide health insurance for the child, and gave Mother sole decision-making authority over the major decisions in the child's life. The court granted Mother's request to restore her maiden name, but denied her request to change the child's last name. The court also awarded Mother a judgment against Father for one-half of her attorney fees.

-3-

Last, the court simplified the visitation schedule so that each party would have four non-consecutive weeks of uninterrupted visitation in addition to the regular weekly visitation, but did not alter the total number of Father's visitation days. The final order was entered March 1, 2010, and Father filed a timely appeal.

## ISSUES

This appeal concerns three major issues: 1) Whether the trial court erred by denying Father's Petition to Modify Child Support; 2) Whether there is a sufficient basis to support the trial court's finding that Father was in contempt of court for violating the parenting plan; and 3) Whether the trial court erred by awarding Mother one-half of her attorney fees.

## ANALYSIS

### I. Modification of Child Support

Father contends that the trial court erred in finding that he was voluntarily underemployed and in denying his petition to modify child support without completing a child support worksheet to determine whether there was a "significant variance" between the amount of child support he was required to pay under the parenting plan and the amount set by the Child Support Guidelines. *See* Tenn. Code Ann. § 36-5-101(g).

A.

As a threshold matter, we must determine whether Father was voluntarily underemployed, as the trial court found. If Father was voluntarily underemployed, then it would be proper to impute additional income to him pursuant to Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I), which could result in a finding that Father is not entitled to a reduction because a significant variance in Father's child support obligation is not present.

The Child Support Guidelines, which govern the determination of child support obligations, "do not presume that any parent is willfully and/or voluntarily under or unemployed." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii). The determination of whether a parent is voluntary underemployed is a question of fact which "requires careful consideration of all the attendant circumstances." *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005) (citing *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002); *Willis v. Willis*, 62 S.W.3d 735, 738-39 (Tenn. Ct. App. 2001)). Such a determination "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii)(I). As this Court has stated:

When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2), as well as the reasons for the party's change in employment. *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003); *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. *Willis v. Willis*, 62 S.W.3d at 738. The courts are particularly interested in whether a parent's change in employment [or amount of income] is voluntary or involuntary, *Eldridge v. Eldridge*, 137 S.W.3d at 21, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary. *Demers v. Demers*, 149 S.W.3d at 69.

*Richardson*, 189 S.W.3d at 726.

In this case, the trial court found that Father was voluntarily underemployed based on the fact that his income from his lawncare business diminished after he moved from Mount Juliet, where his client base was primarily located. The trial court stated, "his income went down, but it was voluntary. He's the one that moved. He is the one that agreed to this and then he moved off." Father insists other facts, which are not disputed, preponderate against this finding. We agree.

Father's main source of income, currently and at the time of the divorce, is from his employment as a full-time firefighter for Wilson County. His income as a firefighter has not declined. At the time of the divorce, Father earned additional income from his lawn mowing business; that income has declined dramatically since the divorce, and Father insists the decline was not due to any voluntary actions on his part. Father testified that the decline in this income was due to several factors: (1) the economic recession caused several of his clients to begin mowing their own lawns; (2) the summer drought inhibited grass growth; and (3) the divorce caused him to lose several clients who were friends of Mother's family. Father also testified that he attempted to solicit new clients using fliers and word of mouth but was unsuccessful. Mother presented no proof to refute this testimony; thus, Father's testimony is undisputed. Father's explanations for the demise of his lawn mowing business are reasonable and there is no affirmative evidence, direct or circumstantial, that Father voluntarily surrendered his clients.

We review the record de novo with a presumption that the court's factual findings are correct, absent a showing that the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *see Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). Considering the record

before us, we have determined the evidence preponderates against the finding that Father was voluntarily underemployed, and additional income may not be imputed to him for that reason. *See Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4-*5 (July 31, 2008).

The record similarly lacks evidence showing that additional income should be imputed due to Father's "education, training, and ability to work," because he had an "extravagant lifestyle, including ownership of valuable assets and resources . . . , that appears inappropriate or unreasonable for the income claimed by [Father]," or for any other reason. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii)(II), (IV), & (VII) (listing situations, in addition to a finding of voluntary underemployment, in which a court may impute income to a parent for the purposes of calculating child support).

We therefore reverse the trial court's finding that Father was voluntarily underemployed and the trial court's decision to impute additional income to Father.

B.

Having determined that Father was not voluntarily underemployed and that additional income may not be imputed, we must next determine whether the trial court erred by denying Father's petition to modify child support. At the outset we note the trial court did not calculate Father's child support obligation using the Child Support Guidelines. When denying Father's petition, the court simply stated its ruling from the bench as follows:

> I'm denying the decrease. That was what they agreed to . . . . I'm just denying it. There is not a substantial variance. He's voluntarily underemployed as far as his agreement is concerned, and he's not entitled to a decrease because he decided to leave his wife and child and move in with a girlfriend and quit his lawnmowing business.

The court also stated from the bench that it was denying Father's petition to modify child support because, "I just find it unconscionable to come in here and agree to pay a certain amount of child support, everything be set on it, then totally quit the business that you agreed upon, and . . . say you've had a decrease." In its Order entered on March 1, 2010, the court held: "The Court finds Father's request for a reduction in child support to be unjust. Father comes into court with unclean hands. Therefore, Father's Petition for a reduction of child support is denied."

We have determined the foregoing findings are not supported by the facts of this case; furthermore, even if these findings were supported by the record, they do not provide a proper basis for the trial court to deny Father's petition. The process and criteria for

determining a parent's child support obligation are governed by the Child Support Guidelines promulgated by the Tennessee Department of Human Services in accordance with Tenn. Code Ann. § 36-5-101(e). Subsequent, post-divorce modifications are governed by Tenn. Code Ann. § 36-5-101(g), which provides that "[u]pon application of either party, the court shall decree an increase or decrease of support when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered . . . ." *See also Kaplan v. Bugalla*, 188 S.W.3d 632, 636 (Tenn. 2006). A "significant variance" is defined as at least a fifteen percent difference "between the amount of the existing support obligation and the amount that the obligation would be if it were based on the obligor parent's current income." *Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995). The burden rests upon the petitioner to prove a significant variance. *See id.* at 345.

The record before us does not contain a child support worksheet showing a calculation of Father's obligation under the Child Support Guidelines using his current income as a firefighter only. Without the benefit of such a calculation, we cannot state with certainty whether a substantial variance exists between the amount that would be owed under the Child Support Guidelines using the parties' current financial information as compared with the amount set forth in the divorce decree in 2007, $398.00 per month. *See* Tenn. Code Ann. § 36-5-101(g); *see also Turner*, 919 S.W.2d at 344. ("The current guidelines require that decisions to modify existing child support orders must be based on a comparison of the amount of the existing support obligation and the amount that the obligation would be if it were based on the obligor parent's current income.").

Accordingly, on remand, the trial court is instructed to apply the Guidelines to determine whether a significant variance is present using Father's income as an employee of the Wilson County Fire Department, Tenn. Code Ann. § 36-5-101(g); and, if such a variance is present, to set child support in the amount required by the Guidelines. Tenn. Code Ann. § 36-5-101(e).

C.

In the interest of judicial economy, we must address one additional issue relating to the calculation of child support. Both parents' respective incomes are to be considered when calculating the amount of the obligor parent's child support payment. Mother is a self-employed graphic designer who works out of her home. At trial, she asserted that she should be allowed to deduct her home office expenses from her income when calculating Father's child support obligation.[1] Father insisted she was not entitled to such a deduction. The trial

---

[1]Tenn. Comp. R. & Regs. 1240-2-4-.04-(3)(a)(3)(i) defines "Self-Employment Income" as "income
(continued...)

court heard arguments on the issue but did not make a formal ruling. Nevertheless, because we are remanding the case to calculate Father's obligation, we wish to clarify that a self-employed parent who works from home is not entitled to deduct home office expenses from his or her income for the purpose of calculating the obligor parent's child support payment. The Guidelines provide that reasonable expenses may be deducted from a self-employed parent's income when calculating child support. Tenn. Comp. R. & Regs. 1240-2-4-.04-(3)(a)(3)(i). However, the Guidelines also expressly state that "the cost of operation of home offices . . . shall not be considered [a] reasonable expense." Tenn. Comp. R. & Regs. 1240-2-4-.04-(3)(a)(3)(ii); *see Beem v. Beem*, No. 02A01-9511-CV-00252, 1996 WL 636491, at *4 (Tenn. Ct. App. Nov. 5, 1996) (holding that the operation of a consultant's home office, even where he did not maintain an additional office outside his home, may not be deducted from his income to calculate child support). Accordingly, on remand the trial court shall not afford Mother a deduction for her home office expenses. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04-(3)(a)(3)(ii).

## II. Contempt

Father contends the trial court committed reversible error when it found him to be in contempt of court. He alleges the finding of contempt was defective because, other than generally stating that "Father is found to be in contempt for his failure to comply with provisions of the Parenting plan," the court failed to identify what Father did, or did not do, that justified a finding of contempt. Father also contends the court erred by failing to state whether he was in civil or criminal contempt, failing to impose a sentence, and, if he was meant to be in civil contempt, failing to assert what he must do to cure the alleged contemptuous conduct.

Although the type of contempt was not specified, it is apparent that Mother was seeking to hold Father in civil contempt rather than criminal contempt.[2] The purpose of civil contempt is to enforce private rights. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005); *see also Robinson v. Air Draulics Eng'g Co.*, 377

---

[1](...continued)
from, but not limited to, business operations, work as an independent contractor or consultant, sales of goods or services, and rental properties, etc., less ordinary and reasonable expenses necessary to produce such income."

[2]As distinguished from civil contempt, "criminal contempt is used to 'preserve the power and vindicate the dignity and authority of the law' as well as to preserve the court 'as an organ of society.'" *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005) (quoting *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn.1996)). Sanctions for criminal contempt are "designed to punish the contemnor." *Id.*

S.W.2d 908, 912 (Tenn. 1964). Four essential elements must be established in order to make a finding of civil contempt. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008). They are:

> First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Id.* at 354-55 (footnotes omitted).

The only finding of contempt by the trial court is stated in paragraph 5 of the Order entered on March 1, 2010. The paragraph reads as follows:

> 5) *Father is found to be in contempt for his failure to comply with provisions of the Parenting plan.* Further Father's allegation that Mother was cohabitating when he co-owned a home with his paramour makes a mockery of the court system. In addition to statutory provisions, the parties['] Marital Dissolution Agreement provided for attorney fees in the event of future legal action to enforce the Agreement. Further Father is found to have unclean hands and his Petition is found to be frivolous and therefore Mother is granted a judgement against Father in the amount of $5,286.13 representing one half of Mother's attorney fees. Said Judgment shall draw interest at the statutory interest rate for Judgments until paid in full.

(Emphasis added).

While the court gives some indication of the reason it found Father in contempt, the order does not clearly specify which act or omission constituted contemptuous conduct; moreover, as Father asserts, no curative action was specified to remedy civil contempt. Immediately following the finding of contempt, the order provides that, "Father's allegation that Mother was cohabitating when he co-owned a home with his paramour makes a mockery of the court system." Perhaps leveling allegations at an opposing party that are unsupported by proof makes a "mockery of the court system;" nevertheless, by simply making the allegation, Father did not violate a direct order of the court. Thus, making the allegation cannot be the contemptuous act.

In the same paragraph, the court stated, "[i]n addition to statutory provisions, the parties['] Marital Dissolution Agreement provided for attorney fees in the event of future

legal action to enforce the Agreement." Clearly, this statement is not a finding of contempt. The court also stated, "Father is found to have unclean hands and his Petition is found to be frivolous . . . ." Having "unclean hands" similarly cannot sustain a finding of contempt, because it does not constitute a violation of any provision of the parenting plan.

In her Petition for Contempt, Mother makes numerous allegations of contemptuous conduct by Father. The Petition reads as follows:

### PETITION FOR CONTEMPT AND TO MODIFY PARENTING PLAN

**COMES NOW** the Mother, **JULIE ANN KENDLE**, (hereinafter referred to as "Mother") and would ask this Honorable Court to find Father, **MATTHEW DAVIS KENDLE**, (hereinafter referred to as "Father") in willful contempt of Court for his failure to comply with the provisions of the Parenting plan incorporated into a Final Decree of Divorce entered in the above matter. . . . In support of said Petition, Mother would show unto this Honorable Court that:

1. A Final Decree of Divorce was entered August 8, 2007 which incorporated a Permanent Parenting Plan executed by the parties;

2. Section I (J)(1) of the Permanent Parenting Plan provides: "Neither party shall have overnight guests of the opposite sex to whom he/she is not married while the child is in his/her custody."

3. Upon information and belief, Father jointly owns a home and resides with one Julie Ashe. Further, upon information and belief and contrary to statement of Father, the minor child of the parties has spent the night at the residence while both her father and Ms. Julie Ashe were present;

4. If in the alternative, the minor child is in fact staying at the paternal grandmother's home, then Father's requirement that Mother make a two hour round trip every few days to pick up the minor child is a violation of the transportation provisions in Section I(H) of the Permanent Parenting Plan;

5. Section III(D) of the Permanent Parenting Plan requires Father to reimburse Mother his pro rata share of uncovered medical expenses. Currently Father owes Mother $153.00;

6. Section III(E) requires Mother and Father to maintain a minimum of $250,000 in life insurance naming the other parent as trustee for the benefit of the minor child. Upon information and belief, Father does not have the required insurance coverage. He has insurance through his employer, but this insurance only covers death occurring "on the job";

7. Mother continues to be uncomfortable at the exchange of the minor child unless in a public place or unless accompanied by a witness. Having a witness readily available is very inconvenient at times. Therefore Mother prefers that all exchanges be made at the Dunkin Donut which is near her home;

8. Soon after the divorce, Father was residing in an apartment in Murfreesboro, Tennessee. Mother was required to meet at the club house and not at Father's residence;

9. Father has since relocated some fifty five (55) miles from where the minor child resides and from where he works, but expects Mother to incur the extra expense of transportation resulting from his relocation;

10. On or about June 3, 2008 Father attended a medical appointment for the minor child. During the visit, Father monopolized over an hour of the pediatrician's time discussing his own general medical knowledge and opinions to the extent that none of the questions pertaining directly to the child's illness were addressed. Mother had to call the doctor later that day to address her concerns about the child and get information as to the care to be provided;

11. Father has demonstrated repeatedly that when it comes to the basic parental care of the parties' minor child when sick, he defers to Mother. He either forgoes or shortens his visits so that Mother can provide the necessary care;

12. Father refused Mother uninterrupted vacation time with the minor child. Father sent Mother an e-mail saying that summer break was for him and she didn't get any time for a vacation;

13. Mother has grave concerns about the fact that Father resides with Julie Ashe who professes to be a witch.

Because the Petition raises many allegations, and the order did not specify which provision(s) of the parenting plan Father willfully violated, we can only speculate as to what act, or failure to act, the trial court based its finding of contempt upon. Was it purchasing a home with a woman to whom Father was not married? Failing to reimburse Mother $153 for his pro rata share of the child's medical expenses? Failing to provide proof of suitable life insurance? Relocating 55 miles from where the minor child resides, thus forcing Mother to incur extra transportation expenses? Monopolizing an hour of the pediatrician's time at the child's doctor's appointment discussing matters that did not pertain directly to the child's illness? Causing Mother grave concern by residing with a woman "who professes to be a witch"?

As noted earlier, four elements must be established in order for a person to be held in civil contempt for violation of a court's order: the order must be lawful as well as clear, specific, and unambiguous; the person must have actually disobeyed or otherwise resisted the order; and the violation must be willful. *Konvalinka*, 249 S.W.3d at 354-55. The lawfulness of the parenting plan or a specific provision of the plan is not at issue in this case; the issue is whether Father disobeyed a specific and unambiguous provision of the parenting plan and, if so, whether he disobeyed it willfully. Two of the four essential elements are not present; the record before us fails to establish either that a specific and unambiguous provision of an order was violated, or that the violation was willful. Thus, there is no basis for this court to affirm a finding of civil contempt against Father.

The foregoing notwithstanding, we understand the trial court was very upset with Father for accusing Mother of cohabiting with a man to whom she was not married without having any proof to support that accusation. However, as we noted earlier, making an allegation in a petition for which one does not yet have proof does not constitute contemptuous conduct if it does not violate a court order. *See Konvalinka*, 249 S.W.3d at 354-58; *see also Robinson*, 377 S.W.2d at 912.

The trial court might also have based its finding of contempt upon the fact that Father resided and co-owned a home with Ms. Ashe before they were married. This is evident from the court's statement from the bench that, "I find it a mockery of the court system to accuse her of quote, 'cohabitating' under a provision of the parenting plan at a time when he co-owns a home with his paramour." However, the parenting plan did not prohibit Father from owning a home with Ms. Ashe, nor did it prohibit him from residing with her when the child was not present. Thus, these actions cannot properly be considered contemptuous. The parenting plan merely provided that, "[n]either party shall have overnight guests of the opposite sex to whom he/she is not married *while the child is in his/her custody*." (emphasis added). There is no evidence in the record to support a finding that Father violated this

provision; in fact, Mother admitted that she had no proof that Ms. Ashe or any other woman stayed overnight with Father when the child was in Father's custody.

The last of Father's acts or omissions addressed in the March 1 order relates to the provision in the parenting plan requiring both Mother and Father to "insure his/her own life in the minimum amount of $250,000 by whole life or term insurance. Until the child support obligation has been completed, each policy shall name . . . the other parent, as trustee for the benefit of the child, to serve without bond or accounting." The order provided that "[c]ounsel for Father shall supply counsel for Mother an 'un redacted' copy of his life insurance policy showing all required information."

In her contempt petition, Mother alleged that, "[u]pon information and belief, Father does not have the required insurance coverage. He has insurance through his employer, but this insurance only covers death occurring 'on the job.'"

At trial, Father testified that he had two policies, one provided by his employer and a separate policy with Ohio National Life Assurance Corporation with an issue date of March 30, 2009. He insisted the latter policy satisfied the requirements of the parenting plan. Father also presented written proof of life insurance at the hearing, but the trial court justifiably found Father's proof – a copy of two pages of the Ohio National policy with essential information redacted[3] – was insufficient to establish that he had obtained the required insurance. Thus, in order to ensure Mother had all the necessary information to collect on the policy for the child, the trial court ordered "counsel for Father [to] supply counsel for Mother an 'un redacted' copy of his life insurance policy showing all required information." Based upon the above facts – that Mother never alleged Father was actually without life insurance, that Father produced proof he had the required insurance through testimony as well as some documentation, and that the trial court apparently did find that Father had the insurance, but simply failed to produce a complete copy of the policy – we do not infer that the trial court found Father in contempt for violating the life insurance requirement; moreover, it if had, we find the evidence insufficient to establish that Father's failure to obey the requirement that he obtain the required insurance was willful.

For the reasons stated above, we reverse the finding by the trial court that Father was in contempt of court for failing *to comply with provisions of the parenting plan*.

_____

[3]During the hearing, Father presented two pages of a life insurance policy with Ohio National Life Assurance Corporation with an issue date of March 30, 2009. The pages state, "[w]e will pay the Death Proceeds of this policy to the Beneficiary subject to its terms after we receive due proof that the insured died while the policy was in force."

### III. Attorney Fees

The parties' marital dissolution agreement, which incorporates the parenting plan, provides:

> In the event it becomes reasonably necessary for either party to engage in legal proceedings to procure enforcement of any provision of this Property Settlement Agreement, he or she shall be entitled to a judgment for reasonable expenses incurred in prosecuting such action including, but not limited to, attorney fees and court costs.

The trial court awarded Mother a judgment for $5,286.13, representing one-half of her attorney fees because she prevailed on several issues at trial, namely that Father was found in contempt, Father's petition to reduce his child support payments was denied, several of Mother's requests for modifications to the parenting plan were granted, and the court found that Father's petition to find Mother in civil contempt was frivolous.

The trial court also found authority to award Mother attorney fees in Tenn. Code Ann. § 36-5-103(c), which expressly authorizes trial courts, in their discretion, to award "reasonable attorney fees incurred in enforcing any decree of alimony and/or child support" to the plaintiff spouse.

We have reversed the trial court's ruling on the issue of child support and remanded that issue for the trial court to determine whether Father is entitled to a reduction based upon his actual income, without imputing income from his now-defunct lawn mowing service. Therefore, we reverse that part of the award of attorney's fees pertaining to the modification of child support, pending disposition of that issue in accordance with the instructions in this opinion. We have also reversed the trial court's holding that Father was in contempt for "failing to comply with provisions of the parenting plan," and therefore also reverse the part of the award related to Father's alleged contempt.

Therefore, on remand, the trial court shall determine whether either party is entitled to recover her or his attorneys' fees, and if so, to make the appropriate award.

Mother additionally requested attorney fees she has incurred on appeal under Tenn. Code Ann. § 36-5-103(c). *See Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *8 (citing *Toms v. Toms*, 98 S.W.3d 140, 145 (Tenn. 2003)) (construing the statute to allow attorney fees on appeal). We consider several factors when determining whether Mother is entitled to attorney's fees on appeal including the parties' success on appeal and whether the appeal was in good faith. *Folk v. Folk*, 357 S.W.2d 828, 828 (Tenn.

1962). Father's appeal was in good faith because he prevailed on important issues. Thus, we respectfully deny Mother's request for attorney fees on appeal.

## CONCLUSION

Based on the foregoing analysis, we reverse the trial court's decision to deny Father's petition to modify child support and remand with instructions that the trial court complete a Child Support Worksheet, which shall be completed using Father's income without imputing additional income, and Mother's income without deducting her home office expenses, to determine whether there is a significant variance and, if so, to set child support as required under the Guidelines. We also reverse the trial court's decision finding Father in contempt.

The judgment of the trial court is affirmed in part, reversed in part, and remanded. Each party is responsible for his and her attorney's fees on appeal and costs of appeal are assessed equally against each party.

_____
FRANK G. CLEMENT, JR., JUDGE