IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 5, 2018

## LEWIS CREED JACKSON v. SHARON SMITH JACKSON

**Appeal from the Chancery Court for Putnam County**
**No. 2012-263     Amy V. Hollars, Chancellor**

_____

### No. M2018-00361-COA-R3-CV

_____

The parties initiated divorce proceedings in 2012. Trial dates were set and then continued a number of times until August 2017, when the trial court issued an order stating that the trial would take place on October 31, 2017, and that there would be no more continuances. Neither the husband nor his attorney appeared for the trial, and the wife proceeded to present evidence in support of her case. The trial court granted the wife a divorce, designated her the primary residential parent, divided the marital property, awarded her child support, and awarded her attorney's fees. The husband moved to have the divorce decree set aside based on excusable neglect, inadvertence, or mistake. The trial court denied the husband's motion, and the husband appealed. On appeal, the husband challenges the trial court's refusal to set the decree aside. He also alleges the trial court erred in dividing the marital property, finding he was voluntarily underemployed for purposes of calculating his child support obligation, and awarding the wife her attorney's fees. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and BRANDON O. GIBSON, J., joined.

Lynda W. Patterson, Livingston, Tennessee, for the appellant, Lewis Creed Jackson.

Martelia Theresa Goff Crawford, Cookeville, Tennessee, for the appellee, Sharon Smith Jackson.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Lewis Creed Jackson ("Husband") and Sharon Smith Jackson ("Wife") were married for twenty-five years and had one minor child who was eleven years old when they separated in February 2012. Husband filed a complaint seeking a divorce in August 2012, and Wife filed an answer and counter-complaint for divorce. Both parents sought to be named the primary residential parent.

The parties attempted to mediate their case in March 2015, but they were unable to reach a settlement. The trial court entered an order scheduling the case to be tried on November 5, 2015. For reasons that do not appear in the record, the trial was rescheduled for July 28, 2016. Father's attorney requested to withdraw from the case on April 11, 2016, which the court allowed by order dated April 22, 2016. Husband's replacement counsel filed a notice of appearance on June 21, 2016, and moved to continue the case on June 27, 2016. Husband's replacement counsel then filed a motion seeking permission to withdraw from representing Husband the following month, on July 18, but the record does not contain a ruling on that motion. The trial court entered an order on April 4, 2017, setting the case for trial on July 13, 2017.

On July 10, 2017, the trial court entered an agreed order to continue the trial date of July 13, 2017, to an unspecified later date. Husband's counsel again moved for permission to withdraw from his representation of Husband on August 22, 2017. The trial court held a hearing on August 31, 2017, and it entered an order that same day allowing Husband's replacement counsel to withdraw "for good cause shown." The order also stated:

> The respondent shall have (15) days to hire a new attorney in this cause and notify opposing counsel. A trial date is set for Oct. 31, 2017 at 9:00 A.M. There will be no more continuances.

Wife and her attorney were present for the trial on October 31, 2017, but neither Husband nor anyone representing Husband appeared in court on that day for the trial of this matter. The trial proceeded in Husband's absence. Wife presented her case by introducing testimony and documents into evidence, and the trial court issued an order and decree of divorce granting Wife a divorce based on Husband's "inappropriate marital conduct." The court divided the marital property between Wife and Husband, named Wife the primary residential parent, awarded Wife her attorney's fees, and awarded Wife child support, both retroactive and prospective. The amount of child support the court awarded was based, in part, on its determination that Husband "intentionally and voluntarily underemployed himself by cutting out his overtime hours" in the year preceding the trial.

Husband filed a motion to set aside the divorce decree pursuant to Tenn. R. Civ. P. 55.02. He claimed that he was not in court for the trial on October 31, 2017, because he thought his attorney was going to have the trial continued. The trial court denied Husband's motion by order filed on February 14, 2018, stating:

1. The Court finds that Plaintiff-Husband brought his motion pursuant to Tenn. Rules of Civil Procedure 60.02 claiming excusable neglect in failure to appear at the final hearing and requesting that the Order from October 31, 2017 be set aside. The Court emphatically denies this motion on the grounds that Plaintiff-Husband was well aware of his court date, and willfully failed to appear in court on October 31, 2017 for the scheduled final hearing in this matter which has been pending since 2012.

2. The Court finds from the testimony of Plaintiff-Husband that he received a copy of the Court's order of August 31st, 2017, allowing his former attorney to withdraw, setting this matter for final hearing with sufficient time for Plaintiff-Husband to obtain an attorney and for an attorney to prepare, and such order stating that no continuances would be granted of the final hearing date.

Plaintiff-Husband further admitted that he neither took a copy of this Order with him to his interview with Kelsy Miller on September 14, 2017, nor to her office on the evening of October 30, 2017, at 4:50 pm, when he paid his retainer, the night before the trial of in [sic] this case.

3. The Court finds that Kelsey Miller and her legal secretary were not advised of the October 31st, 2017 trial date at either the initial interview, any phone calls, or at the time the retainer was paid, or that office would have taken whatever action they could have to protect his interests.

4. Due to the above stated reasons, the Court finds that Plaintiff-Husband, Lewis Creed Jackson, <u>willfully failed to attend the final hearing</u> in this matter on October 31st, 2017, and due to his willfulness in failing to appear in court, the judgment cannot be set aside on "excusable neglect," under T.R.C.P. 60.02.

On appeal, Husband argues that the trial court abused its discretion in denying his motion to set aside the decree of divorce. He also contends the trial court failed to make an equitable division of the proceeds from the sale of the parties' livestock, erred in finding Husband was underemployed for purposes of calculating his child support, and abused its discretion in awarding Wife her attorney's fees.

II. ANALYSIS

A. Motion to Set Aside Decree of Divorce

Husband filed his motion to set aside the court's order pursuant to Tenn. R. Civ. P. 55.02, which provides that a court may set aside a judgment by default in accordance with Rule 60.02 for good cause. The trial court treated the motion as if it were filed pursuant to Tenn. R. Civ. P. 60.02, which provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect . . . .

Rulings on motions to set aside a judgment pursuant to Tenn. R. Civ. P. 60.02 are "best left to the discretion of the trial judge." *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (citing *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993); *see also Banks v. Dement Constr. Co.*, 817 S.W.2d 16, 18 (Tenn. 1991); *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App. 1997). Appellate courts apply an abuse of discretion standard of review to determine whether the trial court erred in denying a party's motion to set aside a judgment. *Henderson*, 318 S.W.3d at 335; *Pryor v. Rivergate Meadows Apartment Assocs. Ltd. P'ship*, 338 S.W.3d 882, 885 (Tenn. Ct. App. 2009).

Our Supreme Court has addressed what it means for a trial court to exercise its discretion properly, stating:

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted). When a discretionary decision is appealed, the reviewing court is not permitted to second-guess the trial court's judgment or substitute its discretion for that of the lower court. *Id*.

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision

will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives.

*Id.* (citations omitted); *see also Henderson*, 318 S.W.3d at 335 (explaining that abuse of discretion standard is "deferential standard").

Husband contends that the trial court should have granted his motion based on his mistake, inadvertence, or excusable neglect and that it erred in finding that he willfully failed to appear at the trial on October 31. Husband acknowledges that he received the trial court's order dated August 31, 2017, in which the court instructed Husband to retain new counsel within fifteen days and made clear that the trial would take place on October 31, 2017, with "no more continuances." He explains that he went to the offices of Kelsy Miller on September 14 with the plan of retaining her to represent him at the trial of this case. Husband asserts that he met with Ms. Miller on this date and informed her of his upcoming trial. Husband claims that Ms. Miller told him she would have the trial continued to allow her time to review the case and prepare herself for trial. During Husband's meeting with Ms. Miller on September 14, Husband was handed a contract to review that set out the terms of Ms. Miller's representation. Ms. Miller required Husband to pay a retainer in the amount of $3,000 before she would agree to represent him. Husband later called Ms. Miller's office in an effort to retain her services and offered to pay a portion of the $3,000 because he did not have the full amount available at that time. Ms. Miller's secretary informed Husband that Ms. Miller required the retainer be paid in full before she would agree to represent him.

Husband did not return to Ms. Miller's office until the late afternoon on October 30, the day before his case was scheduled to be tried. He arrived at the office at 4:50 and saw Ms. Miller as she was leaving the office. Husband interacted with one of Ms. Miller's receptionists/paralegals on October 30 and paid the retainer in full at that time. He asserts that he did not appear in court the following morning because he believed Ms. Miller would arrange for the trial to be continued.

The trial court held a hearing on Husband's motion to set aside the divorce decree on February 2, 2018. Husband testified about his meeting with Ms. Miller on September 14 as follows:

A: I told Ms. Miller about [the court order dated August 31, 2017], and she said it wouldn't be no problem.

Q: Did you bring a copy of that order with you to Ms. Miller's office?

A: I think so.

Q: You think so or you know so?

A:  I'm not really sure if I did or didn't, but I informed her about the date.

. . . .

A:  She said she had to have time to prepare the case and it wouldn't be no problem.  You know, two weeks was not enough for her to prepare the case.

. . . .

Q:  Okay.  What day did you go see Ms. Miller?

A:  September the 14th.

Q:  September the 14th?

A:  Yes, ma'am.

Q:  Okay.  Now, and when was the trial set?

A:  I really don't know.

Q:  You don't know?

A:  No, ma'am, I don't.

Q:  So, you can't even, you can't even tell us today?

A:  I think it's October the 3rd, I'm not sure.

Q:  October the 3rd?

A:  Yes, ma'am.

Q:  Or October the 31st?

A:  Is it October the 31st?  I wasn't for sure.

Husband then testified about his return to Ms. Miller's office on October 30, one day before his case was scheduled to be tried:

Q:  Okay.  So, when you went into Ms. Miller's office on October the 30th, when did you think your court date was?

A:  It was the next day or two.

Q:  Say that again.

A:  It was the next day or two.  I believe - -

Q:  In the next day or two?

A:  - - that - - was on a Friday, and the court date was on a Monday.

Q:  In the next day or two.  Okay.  So, you were on, you were there on the 30th?

A:  Right.

Q:  October 30th?

A:  Yes, ma'am.

Q:  And it was the, October 30th - - 31st was your court date, wasn't it?

A:  Was it a Thursday?

Q:  I don't know.

A:  I don't really know what day.  I knew it was the next day or two.

Husband testified that he did not have an opportunity to speak with Ms. Miller on October 30 because she was on her way out of the office as he was arriving.  Wife's attorney asked Husband what he said to the woman with whom he spoke in Ms. Miller's office on October 30 about his court date the following day.

Q:  What . . . communications did you have with Ms. Holder [Ms. Miller's paralegal/receptionist] other than you wanted to hire Ms. Miller?

A:  I really don't know.  I can't remember.  I can't - -

Q:  Excuse me?

A:  I really can't remember what was said.

. . . .

Q: Had no discussions about the trial?

A: I'm not sure. No, I, I seen [Ms.] Kelly when she come off, when she come out the door. When [Ms.] Kelly come out the door, I seen her, I turned to talk to her, I spoke to her, and I was going to say something to her, and she went on by. I mean, she didn't want to talk, so I just figured that she'd realize what was going on and I was there - -

Q: Knowing how important that court date was, you didn't say anything to the secretary?

A: I may have and may not, I'm not - -

Q: You just don't know?

A: I can't remember. The secretary went and got some papers and come back - -

Q: Uh-huh.

A: - - and I signed them and filled out the check.

Q: Uh-huh.

A: I really don't - -

Q: Well, knowing how important that court date was, and knowing that it was the next day, why didn't you go to court?

A: Well, I had done talked to [Ms.] Kelly about it, and she said there wouldn't be no problem with continuing it.

Michelle Holder, the paralegal/receptionist with whom Husband spoke when he was in Ms. Miller's office on October 30, testified about her interactions with Husband on that day:

Q: Okay. Was Ms. Miller there when he arrived?

A: She was walking out the door as he was there.

Q: Okay. And did he, did Ms. Miller or Mr. Jackson attempt to talk to one another?

- 8 -

A:  There wasn't a conversation.  They may have said, Hi.  I don't - -

Q:  Okay.

A:  - - know.

Q:  And you didn't know who he was when he came in your, in your office, did you?

A:  No.

Q:  So, he had to identify himself?

A:  Correct.

Q:  And what did he tell you he was there for?

A:  To retain Kelsy.

Q:  Okay. So, then you had to look up paperwork for him?

A:  Correct.

Q:  Okay. Now, at any time during that conversation, did he talk to you about a trial date?

A:  I, just from recollection, I believe he may have mentioned that he had one in about three weeks or so.

Q:  So, he said in about three weeks or so?

A:  Correct.

Q:  Okay. Did he hand you any paperwork that, when he came in that day, to show you what the court date was or anything?

A:  No.

. . . .

Q:  Did he ever say, I have court in the morning?

A:  No.

Q: Okay. You would remember that, wouldn't you?

A: At five 'til 5:00, yes, I would remember that.

Ms. Miller testified about her interactions with Husband on September 14, 2017, the date Husband first went to Ms. Miller's office to discuss her representation of him. She was asked whether Husband told her a date had been set for his trial, and Ms. Miller testified as follows:

A: No. No, he did not. And I, I looked back at my notes once I found out about this motion to see if he had ever identified a specific court date - -

Q: Uh-huh.

A: - - and when I looked in my notes, there was no specific court date identified. The only thing that I have reflected in my notes was that Mr. Chaffin was his attorney, and then he said that relationship was no longer going to - -

Q: Okay.

A: - - happen.

. . . .

Q: He didn't give you a trial date, but did he tell you that there was a final hearing set?

A: He told me that they were getting ready for a final hearing. I was trying to figure out where the case was at –

Q: Uh-huh.

A: - - in order to try to quote a retainer fee.

Q: Uh-huh.

A: I had asked him what had happened up to that point, and he had never, he never gave me a specific date. I know that for sure, because if he did, I would have written that down. But, no, he never gave me a specific date. I do remember what we talked about was the amount of depositions that had been taken.

- 10 -

Q: Uh-huh.

A: And that was something that I noted in my retainer letter, because I said I would have to review all that in order to get caught up.

. . . .

Q: Okay. But he did bring, brought no paperwork?

A: None.

Q: Had you spoken with him, did you speak with him on the phone after that appointment? And I'm talking up, up to October 30th.

A: No.

Q: From September 14th 'til October 30th.

A: No. I remember Mr. Jackson leaving after that consultation, he left with the engagement letter –

Q: Uh-huh.

A: - - and then I did not see him or hear from him until October 30th at about 4:55 when I walked out of my office and out the front door.

Q: Okay. Does, does your office have a policy about payment of retainers?

A: Meaning - - before I do anything, before I will put my name to anything, they have to pay the retainer in full.

Q: In full?

A: Yes.

. . . .

Q: All right. On October 30th, 2017, did you see Mr. Jackson in your office?

A: I saw him. And I, it's weird that I remember that specific day –

Q: Uh-huh?

- 11 -

A:  - - because normally if I'm passing clients, I'm not going to remember that, but I remembered him specifically because that afternoon I was running late, I knew I had to get my daughter to her dance class at 5:15, I was running late. I remember running out the door about 4:55. I looked over, I saw Mr. Jackson, I remember thinking, I wondered what had happened to him.

Q:  So, you recognized him?

A:  I recognized him.

Q:  Okay.

A:  And I just waved at him, did not speak. I literally went through the double doors in my office and out the front door –

Q:  Did –

A:  - - and left.

Q:  - - did he speak with you?

A:  No.

After hearing this testimony, the trial court concluded that Husband willfully failed to attend the divorce trial on October 31, 2017, and denied Husband's motion to set aside the divorce decree based on mistake, inadvertence, or excusable neglect. The basis of the court's decision was its finding that Husband had failed to inform either Ms. Miller or her legal secretary that his trial was scheduled for October 31, 2017, at the initial meeting on September 14, 2017, in any phone calls, or when Husband was in Ms. Miller's office on October 30, 2017, to pay his retainer.

As shown above, Husband testified that he informed Ms. Miller about the court date during his initial meeting on September 14, and Ms. Miller testified that she was not so informed. The trial court did not make a specific finding regarding Husband's credibility, but it is clear from the court's order that it believed Ms. Miller's and Ms. Holder's testimony that Husband did not inform either of them that his trial was scheduled for October 31, 2017. According to our Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)); *see also Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (stating

- 12 -

trial judges, who are in the position of observing witnesses and determining credibility, are better able to evaluate facts than appellate judges). Appellate courts do not reevaluate a trial judge's credibility determination unless there is clear and convincing evidence to the contrary. *Kelly*, 445 S.W.3d at 692 (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). To meet this clear and convincing standard, evidence "must eliminate any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)). Husband does not contend that the trial court erred in relying on Ms. Miller's and Ms. Holder's testimony or that the evidence clearly and convincingly contradicted its determination that Ms. Miller and Ms. Holder did not know Husband's trial was scheduled for October 31, 2017, and we conclude that the record supports the trial court's finding on this point.

The party seeking relief from a judgment pursuant to Tenn. R. Civ. P. 60.02(1) carries the burden of proving the basis of his or her claim. *Pryor*, 338 S.W.3d at 886 (citing *Henry v. Goins*, 104 S.W.3d 475, 482 (Tenn. 2003)). This Court addressed the meaning of excusable neglect in *Ferguson v. Brown*, 291 S.W.3d 381 (Tenn. Ct. App. 2008), wherein we noted that "[e]xcusable neglect may have causes ranging from forces beyond a party's control to forces within its control." *Ferguson*, 291 S.W.3d at 388 (citing *State ex rel. Sizemore v. United Physicians Ins. Risk Retention Grp.*, 56 S.W.3d 557, 567 (Tenn. Ct. App. 2001)). The *Ferguson* Court explained that determining whether neglect in a particular circumstance is excusable involves considerations of equity and depends on all of the relevant circumstances. *Id.* (citing *Sizemore*, 56 S.W.3d at 567). The equitable considerations include the reasons for the neglect, the party's good or bad faith, the prejudice to the other party, and the impact of the neglect on the proceedings. *Id.* (citing *Sizemore*, 56 S.W.3d at 567).

Husband offers no explanation for his failure to appear in court on October 31, 2017, other than his belief that Ms. Miller would obtain a continuance of the trial. Husband's testimony on February 2, 2018, does not convince us that he held such belief in good faith. Husband was aware of the trial court's order dated August 31, 2017, directing him to retain a new attorney within fifteen days and clearly stating that there would be no more continuances of the trial. Husband scheduled a meeting with Ms. Miller within the mandated fifteen days from the date of the order, but he did not retain Ms. Miller to represent him for an additional forty-six days. The trial court found that when he met with Ms. Miller on September 14, Husband did not provide Ms. Miller with the order dated August 31, and he failed to inform her of his trial date on October 31. As the trial court found, Husband did not inform either Ms. Miller or her paralegal/receptionist that his trial was scheduled for the following day when he returned to Ms. Miller's office on October 30 to sign the retention contract and pay the retainer fee.

Husband fails to demonstrate how the trial court applied an incorrect legal standard, reached an illogical or unreasonable result, or based its decision to deny his motion to set the divorce decree aside on a clearly erroneous assessment of the evidence. *See Lee Med.*, 312 S.W.3d at 524. As a result, we hold that the trial court did not abuse its discretion in denying Husband's motion to set aside its judgment. Having reached this conclusion, we will move on to consider Husband's arguments concerning the substance of the decree.

### B. Division of Marital Assets

Husband contends that the trial court failed to make an equitable division of the proceeds from the sale of the parties' livestock, which Husband does not dispute was marital property. Husband's brief does not include a table in either the statement of facts or in an appendix that lists the parties' property and debts, as required by Rule 7 of the Rules of the Court of Appeals. This rule provides, in pertinent part:

> (a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

> (b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

TENN. R. CT. APP. 7.

As we have explained in other cases involving the division of marital assets, "'in all cases where a party takes issue with the classification and division of marital property, the party must include in its brief a chart displaying the property values proposed by both parties, the value assigned by the trial court, and the party to whom the trial court awarded the property.'" *Hopwood v. Hopwood*, No. M2015-01010-COA-R3-CV, 2016 WL 3537467, at *6 (Tenn. Ct. App. June 23, 2016) (quoting *Akard v. Akard*, No. E2013-00818-COA-R3-CV, 2014 WL 6640294, at *4 (Tenn. Ct. App. Nov. 25, 2014)); *see also Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010); *Slaughter v. Slaughter*, No. W2007-01488-COA-R3-CV, 2008 WL 1970491, at *2-3 (Tenn. Ct. App. May 8, 2008). Failing to comply with the requirements

of Rule 7 "results in waiver of 'all issues relating to the rule's requirements.'" *Hopwood*, 2016 WL 3537467, at \*6 (quoting *Forbess v. Forbess*, 370 S.W.3d 347, 354 (Tenn. Ct. App. 2011)). As we noted in *Hopwood v. Hopwood*, "[a]lthough we may suspend the requirements of Rule 7 for 'good cause,' *see* TENN. R. CT. APP. 1(b), we discern no such cause to do so in this case." *Hopwood*, 2016 WL 3537467, at \*7. These parties were married for twenty-five years and had acquired various parcels of real estate, numerous vehicles, an unknown quantity of cattle, and numerous items of farm equipment in addition to their items of personal property. Due to Husband's failure to comply with the requirements of Rule 7, we decline to consider Husband's argument concerning the trial court's distribution to Wife of a portion of the proceeds from the sale of the parties' livestock.

### C. Calculation of Child Support

Husband next argues that the trial court erred in finding that he was underemployed when it determined his income for purposes of calculating his child support obligation. In addressing Husband's obligation for child support, the court made the following findings regarding Husband's income:

> 5. The court finds that the income information provided in 2016, to determine child support, shall remain the same, as the father did not provide sufficient any [sic] updated income information (including his wages, cattle sales, farm income, and pension income) for the calculation of child support, and IT IS ORDERED that Child Support shall remain as set at One Thousand One Hundred Twenty Two ($1,122.00) Dollars per month, and shall remain so unless and until this court or the Child Support Division of the District Attorney General's office receives further information about Father's income sufficient to create a significant variance. Said payments shall continue to be made via Wage Assignment, with the father being responsible for any payments pending the effectiveness of said wage assignment.
>
> The Court also finds that after reviewing Father's income records for the past twelve (12) months, it appears that Father has intentionally and voluntarily underemployed himself by cutting out his overtime hours, and also based on Father testimony at depositions in February, 2017, that Father worked and was able to work seven (7) days a week. (Trial Exhibit #5)

Determining whether a party is willfully underemployed is a question of fact over which the trial court has "considerable discretion." *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001); *see also Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at \*4 (Tenn. Ct. App. July 31, 2008); *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003). We review the trial court's findings of fact de novo, affording

- 15 -

them a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Owensby*, 2008 WL 3069777, at *3.

Husband was deposed on February 28, 2017, and his deposition was entered as an exhibit at trial. Husband testified during his deposition that he worked seven days a week and that he had been doing this for the past forty years. A document from Husband's employer was introduced at trial, and this document showed that Husband's overtime hours decreased significantly over the three-year period from 2015 through 2017. In 2015, Husband worked 508 hours of overtime; in 2016, Husband worked 333.6 hours of overtime; and in 2017, Husband worked 154 hours of overtime.

"A party's child support obligation is not measured by his actual income; it is measured by his earning capacity as evidenced by his educational level and previous work experience." *Owensby*, 2008 WL 3069777, at *4 (citing TENN. COMP. R. & REGS. 1240-2-4-.04(3)(a)(2)(ii); *Watters v. Watters*, 22 S.W.3d 817, 820-21 (Tenn. Ct. App. 1999)). When a party testifies that he can earn more money than he currently earns, a court may treat that testimony as evidence of willful underemployment. *Willis*, 62 S.W.3d at 738. Tennessee employs no presumption that a parent is willfully and/or voluntarily underemployed. TENN. COMP. R. & REGS. 1240-2-4-.04(3)(a)(2)(ii).

The trial court determined that Husband was underemployed and that his earning capacity as of October 31, 2017, was the same as it was in 2016, when he was ordered to pay monthly child support in the amount of $1,122. The only testimony from Husband that we have is his deposition testimony, described above. The documentary evidence shows that Husband's overtime hours declined from 508 in 2015 to 154 in 2017, a decrease of close to seventy percent. If Husband had appeared at his trial, he may have been able to offer an explanation for the steep decrease in his overtime hours, which might have led to a different finding by the trial court. In the absence of evidence other than what we have already discussed, however, we conclude that the evidence in the record does not preponderate against the trial court's finding that Husband was voluntarily underemployed at the time of trial. Accordingly, we affirm the trial court's calculation of Husband's child support obligation and order that it remain at $1,122 per month.

### D. Award of Attorney's Fees to Wife

Wife asked the trial court for an award of her attorney's fees, and the trial court determined that an award of fees was appropriate in this case. The trial judge asked Wife's attorney during the trial how she wanted the court to characterize its award, and Wife's attorney requested that the court award the fees as alimony in solido. In its decree, however, the court did not characterize the award of fees as alimony in solido. Instead, the court wrote, "IT IS FURTHER ORDERED that Husband, due to his failure to speedily move this divorce action along, having drug his feet on this matter, he shall be

responsible for Wife's attorneys fees in the amount of Eighteen Thousand Three Hundred Thirty Six ($18,336.00) Dollars."

"'It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders.'" *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) (quoting *Anil Constr. Inc. v. McCollum*, No. W2013-01447-COA-R3-CV, 2014 WL 3928726, at *8 (Tenn. Ct. App. Aug. 7, 2014)); *see also In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001); *Alexander v. JB Partners*, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011). Thus, because the trial court did not characterize its award of attorney's fees to Wife as alimony in solido in its written order, we conclude that the trial court awarded Wife her fees pursuant to Tenn. Code Ann. § 36-5-103(c). The version of this statute that was in effect when this case was tried in October 2017 provided:

> (c) The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Noting that fees awarded pursuant to Tenn. Code Ann. § 36-5-103(c) are "largely discretionary with the trial court," our Supreme Court has stated that it "will only interfere on appeal when a clear abuse of that discretion has occurred." *Keyt v. Keyt*, 244 S.W.3d 321, 334 (Tenn. 2007). In a different case the Court explained that "'[i]n cases involving the custody and support of children, . . . it has long been the rule in this State that counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate.'" *Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005) (quoting *Deas v. Deas*, 774 S.W.2d 167, 169 (Tenn. 1989)). Acknowledging that the prevailing party has "no absolute right to such fees," the *Taylor* Court noted that "their award in custody and support proceedings is familiar and almost commonplace.'" *Id.* (quoting *Deas*, 774 S.W.2d at 170). The *Taylor* Court continued that the trial court could consider the prevailing spouse's ability to pay the fees but that "such consideration will not be controlling." *Id.* (citing *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App.1992)).

The case at bar involved not only the custody of the parties' minor child; it also involved the collection of child support that Husband owed dating back to 2012.[1] Wife is

---

[1]Evidence was introduced at trial that Husband owed child support dating back to 2012 in the total

the party to whom custody of the minor child and child support were awarded, and Husband has not shown that the trial court abused its discretion in awarding Wife the attorney's fees she incurred in this case. We, therefore, affirm the trial court's award of attorney's fees to Wife.

### III. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Lewis Creed Jackson, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

amount of $54,057.